Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/10/2022 09:07 AM CDT

Diana Rodriguez Rodas, now known as
Diana R. Doyle, appellant, v. Ismael
Ramirez Franco, appellee.

___ N.W.2d ___

Filed May 3, 2022.    No. A-21-193.

1. **Child Custody: Appeal and Error.** Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

2. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

3. ____: ____. A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result.

4. **Child Custody: Appeal and Error.** In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

5. **Contempt: Appeal and Error.** In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion.

6. **Child Custody.** Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action.

7. **Modification of Decree: Words and Phrases.** A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently.

8. **Modification of Decree: Child Custody: Proof.** Before custody may be modified based upon a material change in circumstances, it must be shown that the modification is in the best interests of the child.

9. **Child Custody.** In addition to the "best interests" factors listed in Neb. Rev. Stat. § 43-2923 (Reissue 2016), a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child.

10. ____. The fact that one parent might interfere with the other's relationship with the child is a factor that the trial court may consider in granting custody, but it is not a determinative factor.

11. **Judges: Presumptions.** A judge may rely on general knowledge that any person must be presumed to have but cannot decide issues of fact based on peculiar individual knowledge.

12. **Child Custody.** The moral fitness and conduct of the parties, along with other matters, are of great significance in determining questions of custody.

13. **Contempt: Words and Phrases.** Civil contempt requires willful disobedience as an essential element. "Willful" means the violation was committed intentionally, with knowledge that the act violated the court order. If it is impossible to comply with the order of the court, the failure to comply is not willful.

14. **Words and Phrases: Appeal and Error.** Willfulness is a factual determination to be reviewed for clear error.

15. **Contempt: Proof: Evidence: Presumptions.** Outside of statutory procedures imposing a different standard or an evidentiary presumption, all elements of contempt must be proved by the complainant by clear and convincing evidence and without any presumptions.

16. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the District Court for Sarpy County: Stefanie A. Martinez, Judge. Affirmed in part, and in part reversed and remanded with directions.

Renee L. Mathais, of Berry Law Firm, for appellant.

Alton E. Mitchell Attorney at Law, L.L.C., for appellee.

Pirtle, Chief Judge, and Riedmann and Bishop, Judges.

Riedmann, Judge.

## INTRODUCTION

Diana Rodriguez Rodas, now known as Diana R. Doyle (Doyle), appeals the order of the district court for Sarpy County which modified custody of the child she shares with Ismael Ramirez Franco and held her in contempt of court. For the reasons set forth below, we affirm in part, and in part reverse and remand with directions.

## BACKGROUND

Doyle and Franco were married in 2007. Their minor child, whose custody is at issue here, was born in 2010. A decree dissolving the parties' marriage was entered in 2015, and therein, the district court approved and incorporated the parties' mediated custody and parenting time agreement. The agreement permitted Doyle to move back to California and awarded the parties joint legal custody. Physical custody of the child was to alternate every 2 years for as long as the parties live in two states or upon further order of the court. Thus, the child was to live in Omaha, Nebraska, with Franco from August 2015 until August 2017, at which time, he would move to California to live with Doyle for 2 years. The noncustodial parent was to receive parenting time with the child for winter break, spring break, and summer break. Either parent was permitted to schedule additional visits or travel to the other parent's home state to visit with the child living there, at his or her expense.

Doyle filed the operative complaint to modify custody in September 2019, seeking sole legal and physical custody of the child. In response, Franco filed an answer and counterclaim also requesting modification of custody but asking the court to award sole legal and physical custody to him. Trial was held in July and August 2020. We will summarize some of the evidence presented at trial here and provide additional details in the analysis section below.

The child lived with Franco from 2015 until 2017. During that time, he was in special education classes in school, had an individualized education plan (IEP), and was in speech therapy for stuttering. Although Doyle was living in California, she maintained communication with the child's teacher, donated supplies to his classroom, and attended IEP meetings. She would also travel to Nebraska prior to her visitation times in order to volunteer in the child's classroom.

Doyle began to have concerns about the child during her spring 2016 visit because he looked very thin and unhealthy, his speech was not improving, and he had anxiety. At the end of her visitation, he cried, held on to her tightly, did not want to return to Franco, and became anxious before she even drove him to Franco's house. Likewise, at the end of Doyle's summer visitation, the child did not want to return to be with Franco. Doyle reassured him that he would have fun with Franco, that she would call him and see him again, and that he would be "okay."

When custody switched and the child went to live with Doyle in August 2017, she observed that he was very anxious about being left alone and scared if she left his side, he was wetting the bed, he was not socializing with children his age, he was shutting down, and he wanted her to stay with him for at least an hour at school until he felt comfortable and safe. When asked what she meant by "shutting down," Doyle explained that if someone asked the child a question or he became nervous, he would put his head down, not make eye contact, and not engage in conversation. She had encouraged

Franco to enroll the child in extracurricular activities while he was in Nebraska, but Franco did not do so. So once the child moved to California, Doyle enrolled him in martial arts to help his self-esteem, encourage him to be more outgoing with other children, and allow him to be around his peers outside of school.

In September 2017, Doyle enrolled the child in therapy with Alfredo Huerta, a family therapist, licensed clinical social worker, credentialed school psychologist, and doctoral candidate in California. At that time, the child was having approximately 10 nightmares per week, so one of his therapy goals was to eliminate the nightmares. The child was also hypervigilant and afraid that Doyle would leave and that Franco would return and take him. The child reported to Huerta that he was "terrified" that he had to see Franco and was afraid of him.

Toward the end of 2017, Huerta noticed that the child's nightmares had decreased or disappeared completely, which was a significant improvement. Huerta testified that typically, the child had a "dark cloud hanging over him represent[ing]" Franco. The child repeatedly told Huerta that he did not want to go with Franco or speak to him and that Franco was mean and rude. Huerta continued to validate the child's feelings while also reminding him that he had to follow the rules, which required him to have visits with Franco.

The child made other improvements during that time as well. By November 2017, he no longer had an IEP, was moved from special education classes into all mainstream classes, and no longer needed speech therapy. Doyle observed that the child was more outgoing, was willing and able to express his feelings, and was less afraid to play outside and ride his bicycle. Doyle further noted that the child had begun to participate in class and that his nightmares and bed-wetting had improved as well.

As Franco's Christmas 2017 visitation approached, Doyle noticed that the child's nightmares and separation anxiety returned, and he expressed to her that he was afraid Franco

would pick him up and take him and that he would not see her again. The exchange occurred outside Doyle's house. When Franco arrived, the child did not want Doyle to leave and held onto her tightly. Doyle told him that he had to go with Franco, but reassured him that he would have fun, that it would be "okay," and that he would be back soon. Franco testified at trial that Doyle had requested the presence of law enforcement officers at the exchange, and he claimed that they asked him if he had threatened Doyle and that when he showed them his cell phone to prove that he had not done so, he was allowed to leave with the child.

Franco did not exercise his spring 2018 visitation. Doyle testified that she discussed the visit with Franco but that he would not give her an explanation as to why he was not coming to get the child. Franco, on the other hand, asserted that he called Doyle regarding the visitation but that she never answered his calls. Regardless, he did not travel to California to retrieve the child in the spring of 2018.

The child did well during the 2017-18 school year, earning several awards in mainstream classes, including student of the week, student of the month, "golden ribbon," and a mathematics achievement. As Franco's summer 2018 visitation approached, Doyle again began to see a change in the child in that he started becoming anxious again and was not eating much. She also received reports from his teachers expressing concerns. The child was continuing to attend therapy with Huerta, who noticed a pattern where the child's symptoms would improve and then, after his having contact with Franco, would regress. Upon Huerta's recommendation, Doyle took the child to therapy more frequently as Franco's summer visitation approached.

In June 2018, Huerta and the child discussed the child's not wanting to go to Nebraska with Franco, and Huerta reminded the child that he had to accept the court's rules. Huerta's therapy notes from that timeframe reveal the child's distress, including anxiety, fears, and nightmares, over being required

to go with Franco for the summer. The summer visitation exchange occurred outside of Doyle's house, and Franco testified that law enforcement officers were again present when he arrived. Doyle stated that during the exchange, the child was crying and did not want to go, and Franco likewise described the child's demeanor as "[e]motional." According to Doyle, Franco pulled the child away from her and physically had to put him into his vehicle.

When the child returned to Doyle in August 2018, he was happy to be back with her, but Doyle had him continue therapy with Huerta because she noticed that he still displayed some anxiety symptoms and was shutting down. When the child returned to school, he remained in all mainstream classes with no IEP or speech therapy. In his therapy sessions with Huerta throughout the fall of 2018, the child reported that when he had been with Franco over the summer, Franco was drinking and driving while the child was in the vehicle and asked the child to get him a beer; he also reported that Franco kept him in the house all day, that they did not go anywhere for weeks, that he got bullied by a neighbor, and that Franco would not protect him. He further disclosed to Huerta that Franco slapped him, hit him with a sandal, hit him in the face with a belt, and put him in a dark basement. The child told Huerta that Franco yells at him and that he did not want to go back to Nebraska.

As Franco's Christmas 2018 visitation approached, the child's anxiety symptoms again began to increase. His nightmares returned, and he repeatedly told Huerta that he did not want to go with Franco, that he was nervous about going, that Franco was "'mean,'" and that he was afraid of Franco. Huerta did some role playing with the child to help him learn to better communicate his wishes to Franco, and the goal was that the child's symptoms would decrease as he developed a better relationship with Franco.

Franco testified that he asked Doyle if he could pick the child up a few days early for his Christmas 2018 visitation because he was going to plan a surprise birthday party for

him and that Doyle agreed. According to Franco, when he arrived, law enforcement officers were present and asked him for documentation proving that he was permitted to take the child, and because he did not have it with him, they would not allow him to take the child. He was upset because he had to cancel the birthday party he had planned for the child, for which he had spent approximately $2,500. Franco claimed that he made one attempt to retrieve the child for his Christmas visitation.

Other evidence, however, establishes that the parties made two attempts to facilitate the exchange in December 2018. The record includes two reports from the Riverside County Sheriff's Department in California, showing that officials were present for attempted exchanges on December 19 and December 21. Doyle explained that she requested a "civil standby" to be present at the exchange because of the verbal abuse and aggression Franco had exhibited toward her, which had increased over the past few years. In addition, after the child talked to Franco on the phone about this visit, the child was nervous, angry, and upset because he felt that Franco would not understand his feelings. Doyle testified that she tried to alleviate the child's anxiety and concerns by telling him about the fun things he could do with Franco and reassuring him that he would be back in a couple of weeks.

According to Doyle, at the parties' first attempted exchange on December 19, 2018, law enforcement officers stayed for approximately 30 minutes in an effort to convince the child to go with Franco. Doyle's current husband testified that he arrived home during the attempted exchange on December 19 and observed the officers speak with the child alone. Doyle's husband is a police officer, with a different agency than the officers present at the exchange, and he arrived home from work wearing his uniform but testified that he did not know the officers who were present and that he did not interfere in the exchange other than to attempt to encourage the child to go with Franco. He said that the child's bags were

packed and ready to go, but that the child was reluctant, afraid, and very hesitant to go. The sheriff's report substantiates that officers were present at Doyle's home on December 19 for approximately 30 minutes. By that point, according to Doyle, Franco was upset, but the parties agreed to try again at a later time.

Doyle asserted that Franco arranged the second exchange attempt, which occurred 2 days later on December 21, 2018, at the sheriff's department, and that he was the one who requested the presence of law enforcement officers. The sheriff's report corroborates that that attempt occurred at the sheriff's department on December 21. Doyle testified that the officers talked to Franco, talked to her, and talked to the child, alone, but ultimately brought the child back to her because he did not want to go with Franco. At that point, according to Doyle, Franco again became upset and left, and she did not hear from him again regarding that attempted exchange. She claimed that during the attempted exchange, Franco yelled at her and did so in front of the child.

Franco did not try to exercise his spring 2019 visitation. He testified that by that time, Doyle had commenced proceedings to modify custody, so he had to hire an attorney and could not afford to travel to California. He claimed that his decision not to exercise that visitation was additionally informed by his prior experiences with law enforcement presence at previous exchanges. On cross-examination, Franco was asked to clarify his testimony, and the following exchange occurred:

> [Q.] And then, you did not attempt to exercise your parenting [time] in spring of 2019?
>
> [A.] I couldn't do it. I already told you.
>
> [Q.] Well, you didn't try.
>
> . . . .
>
> [Q.] . . . You didn't try. Isn't that correct?
>
> [A.] I didn't try. How about that? Okay? Happy?

According to Doyle, the child did "great" during the spring semester of the 2018-19 school year, remaining in

mainstream classes and continuing therapy. He also continued doing martial arts and playing with cousins and neighborhood friends.

Doyle understood that the child was to move back to Nebraska with Franco in August 2019, and although she had commenced litigation by that time and was seeking sole physical custody, she testified that she intended to return the child to Franco. The child's anxiety symptoms returned as the custody exchange approached. For example, in July, the child reported to Huerta that he had had one or two nightmares that week because he was afraid that Franco was going to come in August and take him to Nebraska for 2 years "against his will." Later that month, the child again reported having nightmares that he would have to go with Franco and reported that he did not want to play outside of his house for fear that Franco might "'kidnap'" him. In early August, the child told Huerta that he was afraid that Franco would come to pick him up and said that he could not sleep, felt nauseous, had pain in his stomach, and was afraid to go live with Franco because Franco had done "'bad things.'"

The parties attempted to exchange the child multiple times in August 2019. Doyle and her husband helped the child pack his bags in preparation for the exchange, but according to Doyle's husband, the child's demeanor about going with Franco was "[c]omplete refusal." Franco testified that he observed the child's bags packed and ready to go but claimed that law enforcement officers were present at each attempted exchange and that they would "interfere" and would not allow him to take the child with him.

Although the record is a bit unclear, it appears that exchange attempts were made at the sheriff's department and at the child's school, and possibly outside of Doyle's home. The record includes a sheriff's report for an attempt made on August 15, 2019, at the sheriff's department and a second report from August 19 that details an attempted exchange made at the child's school. Franco testified to two previous

attempts at Doyle's house and testified that he arranged the
August 15 meeting at the sheriff's department.

According to Doyle, on August 15, 2019, the child was very
upset, sad, and very much in denial. She tried to calm him
down and encourage him to go with Franco, but he refused. An
officer present at the time spoke to the child privately to try to
convince him to go. When the officer was done speaking with
the child, he brought him back to Doyle and then went to speak
with Franco. The officer then came back to talk to Doyle, and
Franco was upset and left.

Later that day, Doyle sent Franco a text message informing
him that she was able to convince the child to meet and speak
with him if she and the child's friend could come along and
asked if Franco was willing to do so. The following morning,
Doyle sent Franco another message asking to meet with him
one-on-one to talk about the child. Franco acknowledged hav-
ing received both messages from Doyle and admitted that he
did not respond to either message.

On August 19, 2019, Franco went to the child's school to
attempt to retrieve him and take him back to Nebraska. The
school notified Doyle, and she went to the school with the
child's belongings. There was a law enforcement officer pres-
ent at the school, but Doyle had not requested his presence.
Prior to Doyle's arrival, there was a discussion among the
child, the principal, the assistant principal, a therapist or coun-
selor, Franco, Franco's mother, and the officer, all attempting
to convince the child to go with Franco. Doyle was not present
for the discussion and did nothing to prevent the child from
going with Franco. The attempt lasted almost 3 hours, but ulti-
mately, the child did not go with Franco.

Franco remained in California and attempted through mul-
tiple channels to retrieve the child. He testified that he spoke
to the "commander in chief" at the sheriff's department and
spoke to "different branches of peace officers." He hired
an attorney and eventually met with the district attorney's
office, which identified a process it could undertake to gain

possession of the child for Franco. The district attorney applied for a protective custody warrant from the Riverside County Superior Court of California, and the warrant was issued the same day. Thereafter, the child was physically extracted from school based upon the warrant, and he and Franco returned to Nebraska. Franco's phone records establish that he was in California from August 14 through 29, 2019.

Based on the difficulty Franco had retrieving the child, when he returned to Nebraska, he filed a motion with the district court to suspend Doyle's visitation. Within that motion, he claimed that police officers removed the minor child from Doyle's home and placed him in Franco's care. He sought suspension of Doyle's parenting time based on an allegation that Doyle would attempt to remove the child back to California. At the same time, Franco filed an application to hold Doyle in contempt for failing to grant him his court-ordered parenting time. In response, Doyle asked that the court deny the motion to suspend her visitation or, in the alternative, allow her to have supervised visitation. The court granted Doyle supervised visitation in Nebraska for 3 hours on a weekday and 3 hours on a weekend day. In order to facilitate her visitation, Doyle rented a residence in Omaha.

When the child first returned to school in the fall of 2019, he was very shy and timid, but he began to improve as time passed. Franco acknowledged that the child's grades were not very good in the fall semester, but they, too, improved throughout the school year. However, the child again had an IEP, returned to speech therapy, and resumed wetting the bed.

At the time Franco testified at trial in August 2020, the 2020-21 school year had just begun and the child was doing remote learning due to the COVID-19 pandemic. Franco explained that he helps the child sign onto his virtual learning in the mornings and helps with his homework, but he expected the child, at 9 years old, to be responsible for his own schooling. Franco did not have the child enrolled in any extracurricular activities, even prior to the pandemic.

Franco did, however, begin taking the child to therapy in September 2019 with Jennifer Sharp, a licensed independent mental health practitioner. Sharp's initial diagnostic impressions of the child were persistent depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder. Over time, however, the depression subsided, the anxiety peaked to where the child was having panic attacks, and the post-traumatic stress disorder remained but became milder. Regarding the anxiety diagnosis, Sharp testified that the child had a lot of anxiety and worried about the custody situation in that he was scared of the outcome, did not know what was happening, and did not get to have a voice about where he wanted to be.

Sharp explained that the post-traumatic stress disorder was triggered by the events the previous month surrounding the custody exchange. She testified the child told her that the police went to his school to retrieve him and put him in handcuffs, that he did not know what was going on, and that he thought he had done something wrong and the police were going to shoot Franco. He was very scared, talked to Sharp about that event often, and had nightmares and flashbacks of that incident.

Sharp also testified that the child disclosed to her that Doyle had slapped him in the face on some occasions and locked him in a dark closet, which Sharp said was "very scary" and "traumatizing" for a child. The child was also experiencing nightmares and flashbacks of that event. The child told her that he did not want to go near Doyle's bedroom because he was scared that she would put him in the closet again. Sharp further explained that Doyle's husband is a police officer and that when the child sees him wearing his gun, the child gets scared because he does not know what Doyle's husband is going to do with the gun.

Sharp provided both individual therapy to the child and family therapy for the child and Franco, working with them to improve their relationship. She said she also worked with the child on improving his relationship with Doyle, although

Doyle has not participated in the child's therapy with Sharp. Sharp was aware that Franco locked the child in a basement as a form of discipline, so part of her work in family therapy included explaining to him that that was not appropriate. Sharp was aware that the child had reported to Huerta that he was afraid of Franco, but testified that the child told her he was not afraid of Franco. Sharp confirmed, however, that there were a significant percentage of sessions in which Franco was also in the room with the child.

Sharp referred the child to a clinical psychologist, Dr. Joseph Stankus, for psychological testing. Stankus spoke with Franco in December 2019 and January 2020 and also interviewed the child in January. Stankus acknowledged that he refused to talk to Doyle because he did not "want to be embroiled in a custody battle" and that he was afraid he would be pulled into this matter if he interviewed her.

Stankus diagnosed the child with adjustment disorder with mixed anxiety and depressed mood, which occurs when someone is having trouble adjusting to his or her situation at the time. Here, the child was struggling with the custody arrangement and the ongoing conflict between Doyle and Franco. Stankus also diagnosed the child with childhood-onset fluency disorder, which essentially reflected his difficulty with stuttering. At the time of Stankus' evaluation, the child was still in speech therapy. Stankus explained that anxiety is a strong trigger for stuttering; thus, he would "[a]bsolutely" expect that a person would stutter more when under stress. Stankus further diagnosed the child with "parent/child relational problem," which reflected the apparent conflict between the child and Doyle. Stankus opined that this problem began when the child was living in California with Doyle.

Finally, Stankus diagnosed suspected child neglect and suspected childhood physical abuse. He testified that the child reported to him that Doyle would leave him for hours at a time and that in 2017, she slapped him in the face and left a bruise. The child also told Stankus that Doyle had hit him

at a supervised visit in January 2020 and that she locked him in a closet on two occasions.

Stankus explained that he completed an assessment comprising information provided by Franco and by the child's teacher. With regard to the parent-rating scale, Franco did not see too many problems, except for the child's social relations that seemed to be isolated at times. On the other hand, the information provided by the child's teacher led to findings that the child seemed depressed, withdrawn, pessimistic, and sad.

The mental health therapist who supervised visits between Doyle and the child testified that she began her supervising duties in February 2020. She generally testified that the child and Doyle appeared to have a close relationship, were engaged with each other during visits, were playful and interactive, and would give each other a hug and kiss at each visit. At one visit, they watched a movie, and the child sat on Doyle's lap of his own volition and asked when he would see her again.

At a visit in June 2020, however, the child arrived very upset, agitated, and aggressive, which was out of character from his normal demeanor. Doyle attempted to comfort him, but he was upset about the court proceedings. Doyle tried to explain and alleviate his concerns, but the child stood up the entire visit; was pacing, very fidgety, aggressive, and angered; and would not allow Doyle to speak. In the visitation supervisor's opinion, Doyle acted appropriately as the child's mother by intervening and attempting to alleviate his concerns. The visitation supervisor, however, ended up sending Franco a text message that the child wanted to leave, although she did not agree with ending the visit early, because Doyle was responding appropriately to the child's concerns.

Franco called the visitation supervisor the following day and threatened to cancel that day's visit but decided to leave the decision up to his attorney and the child. The visit occurred, and the child's behavior was completely different from the previous day and more normal in the sense that he was playful, was interactive, and stayed in close proximity to Doyle

during the visit. Doyle was also supposed to have visits on June 27 and 28, 2020, and Franco had confirmed them on June 5. However, Franco canceled them the week they were supposed to occur even though Doyle was already in town from California.

In addition to the minor child at issue here, the parties have an older son, Nathan Ramirez Rodriguez (Nathan), who was 21 years old at the time of trial. Nathan is Doyle's biological child, and Franco adopted him during the parties' marriage. After the parties divorced, Nathan moved back to California with Doyle. Nathan was unaware that Franco was not his biological father until, at some point, he found a letter revealing that he had been adopted. Nathan believed that this discovery occurred sometime around the time Doyle and Franco got divorced and that it happened before he and Doyle moved to California. Franco claimed that Doyle intentionally left the letter where Nathan would see it. Franco testified that he wanted to tell Nathan the truth but that he and Doyle agreed not to do so.

According to Franco, after Nathan learned he was adopted, he was very upset with Franco. At trial, Nathan described his relationship with Franco as "[n]onexistent," and Franco likewise said their relationship is "hardly nothing." Nathan has not had a visit with Franco since he and Doyle moved to California after the divorce. Franco never sent Nathan any birthday gifts or Christmas cards and did not attend his high school graduation. Nathan said that Franco was never there and that there was too much pain, physical and mental violence, and aggression.

Nathan described a phone call in 2017 between Doyle and Franco. He testified that he took the phone from Doyle because Franco was harassing her, calling her names, insulting her, diminishing her, and threatening her. According to Nathan, Franco said to him, "'I should have killed your mother and left her dead, and I should have killed you too.'" Nathan testified that since that time, Franco had made similar comments

to Doyle almost every time they are on the phone, and that it occurred most recently about a month before trial. At that time, Nathan overheard Franco calling Doyle names, yelling, and getting violent over the phone. Nathan admitted that he is scared of Franco.

A recording of a June 2020 phone call between Doyle and Franco was received into evidence. In it, Franco can be heard using vulgar language and repeatedly calling Doyle names. In addition, Franco repeatedly refused to allow Doyle to talk to the child and threatened to block her from calling his phone, and he ultimately did block her phone number. The child was present during the call. Doyle testified that the language heard on that call is common language that Franco uses with her.

At trial, Franco denied having anger issues or making vulgar statements to Doyle in the recorded call, alleging that the last time he made such comments to her was in 2015. He admitted, in general, to calling Doyle vulgar names, and when asked whether he thought it was appropriate to call the mother of his child a vulgar name, he said that when he does so, he has his reasons.

After the conclusion of trial, the district court entered a written order. The court found that both parties had met the burden of showing a material change in circumstances and that a modification of custody was in the best interests of the child. The court awarded sole legal and physical custody to Franco. Doyle received parenting time the third weekend of every month from Friday evening until Sunday evening or Monday evening if there is no school that day. She also received 2 weeks of uninterrupted parenting time in the summer.

The district court additionally determined that Franco met his burden of proof as to his application for contempt and ordered Doyle to serve 10 days in jail or purge herself of the contempt order by paying Franco $6,000 by June 15, 2021. The court later clarified that the $6,000 was the total of the $2,500 that Franco lost by canceling the birthday party he had planned for the child in December 2018 and the

$3,500 he spent traveling and remaining in California in August 2019. Doyle appeals.

## ASSIGNMENTS OF ERROR

Doyle assigns, consolidated, restated, and renumbered, that the district court erred in (1) finding the existence of a material change in circumstances supporting a modification of custody, (2) finding that it was in the child's best interests to award his custody to Franco instead of to her, (3) declining to make a less significant change to the parenting plan, (4) finding that she was in civil contempt, (5) ordering a purge plan with payment amounts that were impossible for her to pay, and (6) imposing incarceration as part of the civil contempt proceedings.

## STANDARD OF REVIEW

[1] Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

[2,3] An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*. A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id*.

[4] In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

[5] In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error,

and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018).

## ANALYSIS

*Modification of Custody.*

Doyle raises several issues related to the district court's decision to modify custody. She asserts that the court erred in finding the existence of a material change in circumstances to support modifying custody and in determining that awarding custody to Franco, rather than to her, was in the best interests of the child.

[6,7] Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Schrag v. Spear, supra*. A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Id*.

Doyle first claims that the court erred in finding the existence of a material change in circumstances. Although the district court here did not specifically iterate the details of the material change in circumstances it found to be present, we understand from our de novo review of the evidence presented at trial and the parties' arguments that the material change is the effect the 2-year rotating custody arrangement and the conflict between Doyle and Franco have had on the child. It is clear that the child was experiencing significant anxiety related to the current custody arrangement, such that both parties enrolled the child in counseling to help him address his anxieties. Stankus diagnosed the child with adjustment disorder with mixed anxiety and depressed mood, which he attributed to the difficulty the child was having adjusting to the custody arrangement and the conflict that existed between Doyle and Franco. Similarly, one of Sharp's diagnostic impressions of

the child was generalized anxiety disorder, and she explained that the child has a lot of anxiety and worries about "the whole custody issue," that he was scared of the outcome, that he did not know what was happening, and that he did not have a voice about where he wanted to be.

Had the court at the time the decree was entered known that this arrangement would have such a negative effect on the child, it certainly would not have approved it. We therefore conclude that the district court did not abuse its discretion in determining that there was a material change in circumstances affecting the best interests of the child.

Doyle next argues that the district court erred in finding that the child's best interests would be served by placing his custody with Franco rather than with her. We agree.

[8] Before custody may be modified based upon a material change in circumstances, it must be shown that the modification is in the best interests of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016), requires a court, in determining custody and parenting arrangements, to consider certain factors relevant to the best interests of the minor child, including:

> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
> (c) The general health, welfare, and social behavior of the minor child;
> (d) Credible evidence of abuse inflicted on any family or household member. . . ; and
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

[9] In addition to these statutory "best interests" factors, a court making a child custody determination may consider

matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear, supra*.

The district court's order thoroughly summarized the evidence presented at trial. After doing so, the court observed that this case is complex and not easily decided. It found that both parties were fit, love the child, and see to his needs, albeit in different ways. The court observed that both parties engaged in inappropriate discipline and discussed the case with the child, which contributed to his emotional distress, but that each party identified his needs and sought similar treatment for him. Thus, the "main issue" for the court was how each party handled his or her dislike for the other, and it found that Doyle handled her dislike of Franco by involving law enforcement in the child exchanges, which the court characterized as Doyle's efforts to "thwart" Franco's parenting time and circumvent the court's orders. Therefore, the district court concluded that it was in the child's best interests to award sole legal and physical custody to Franco.

[10] Although the fact that one parent might interfere with the other's relationship with the child is a factor the trial court may consider in granting custody, it is not a determinative factor. See *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009). Thus, to the extent the district court found that Doyle attempted to interfere with Franco's relationship with the child and relied on that as the determinative factor in its decision to award custody to Franco, this was an abuse of discretion.

That is not to say that Doyle's actions were not to be considered when assessing the child's best interests. The fact that Doyle requested that the exchanges occur at the sheriff's

department could, but does not necessarily, indicate ill intentions or an attempt to interfere with Franco's parenting time. It is not unheard of, especially in cases with high conflict between the parents, for a trial court itself to order that exchanges of a child occur at a police station or sheriff's office. See, e.g., *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). And Doyle claimed that she requested law enforcement presence at the exchanges because of the history of verbal abuse and aggression Franco has exhibited toward her and the fact that his hostility toward her has increased over the past several years.

The recorded phone call from June 2020 demonstrates this anger and aggression and the manner in which Franco is willing to speak to Doyle, including doing so in front of the child. Nathan likewise described a 2017 phone call where Franco threatened both him and Doyle, and he admitted that he is scared of Franco. Over the course of almost 2 years, the child repeatedly told Huerta that he was afraid of Franco. The child's teacher became visibly emotional when recounting a time that Franco came to the school and yelled at her and the school secretary for allowing Doyle to volunteer in the classroom as often as she was and her attempt to deescalate his anger. This evidence suggests that if not the primary reason, at least an additional reason, for involving law enforcement in the child exchanges was Franco's aggressive behavior.

The court described Doyle's requests for civil standbys as a "form of bullying," stating that Doyle had requested this on "multiple instances" "while her husband is also present in uniform." The evidence reveals, however, that Doyle's husband was present on only one occasion, during which he attempted to facilitate, not hamper, the transition. Additionally, Franco, himself, requested on occasion that the exchanges occur at the sheriff's department. Therefore, we do not view Doyle's requests as "passive-aggressive" as described by the district court.

Further, the undisputed evidence establishes that the child did not want to go with Franco. As far back as Doyle's spring break with the child in 2016, the child cried, held on to her tightly, did not want to return to Franco, and became anxious before Doyle even arrived at Franco's house. The child's symptoms, in the form of things such as nightmares and anxiety, increased any time a visit with Franco was approaching or when he talked to Franco on the phone.

The child's reaction to going on visits with Franco during his 2 years with Doyle ranged from hesitation and reluctance to fear to outright refusal. There were times neutral parties were unable to convince the child to go with Franco, such as Christmas break 2018, where officers talked to the child on two separate occasions but were unable to persuade him to go with Franco, and August 2019, where a subsequent attempt to complete the custody exchange resulted in a meeting at the school among the child, the principal, the assistant principal, a therapist or counselor, Franco, Franco's mother, and a police officer, and the child still refused to go with Franco.

An April 2019 therapy note reports that Huerta asked the child what he would say if he could talk to the judge deciding this custody matter and that the child replied that "'all [Franco] is saying are lies.'" At that same time, when Huerta asked the child to draw pictures, the child drew a picture of himself killing Franco with a knife, which Huerta explained indicated a profound fear of and anger at Franco. The child then said that he did not want to draw any more pictures about Franco or his family because he gets nightmares.

We recognize Sharp's testimony that the child told her that he is not afraid of Franco. Yet, Huerta's therapy notes from September 2017 through August 2019 are replete with statements from the child that he is afraid or "terrified" of Franco, that the fear causes him to lose sleep and experience nausea and stomach pain, that he did not want to go with Franco and wanted to stay with Doyle, that he was upset and frustrated that he had to go with Franco under the court's orders, that

he had a nightmare that Franco threatened to kill Doyle and her husband unless the child went with Franco to Nebraska, that he hates Franco, that he did not want to speak to Franco because it gives him anxiety, that he had nightmares in August 2019 because he felt that Franco was going to come and take him to Nebraska for 2 years "against his will," that he was afraid to play outside of Doyle's house for fear that Franco might "'kidnap'" him, and that he was afraid to live with Franco because Franco has done "'bad things.'"

The district court noted Huerta's testimony that he did not believe the child had been coached to make the comments that he did because he believes that when children's stories stay the same, they have not been coached. The court found this testimony "inconsistent with the indicators of coaching that are regularly seen in custody cases." It is unclear whether the court concluded that Doyle had, in fact, coached the child to make the claims that he did, but there is no evidence in the record to support the court's finding as to the indicators of coaching seen in other cases.

[11] A judge may rely on general knowledge that any person must be presumed to have but cannot decide issues of fact based on peculiar individual knowledge. 89 C.J.S. *Trial* § 1186 (2012). See, also, *In re Interest of G.R.*, 348 N.W.2d 627 (Iowa 1984); *Lambert v. Cromer*, No. 98,906, 2008 WL 2370076 (Kan. App. June 6, 2008) (unpublished opinion listed in table of "Decisions Without Published Opinions" at 184 P.3d 993 (2008)). It is an abuse of discretion for the trial judge to interject the judge's personal "'extra judicial familiarity'" with facts in making findings. 89 C.J.S., *supra*, § 1186 at 616. Thus, the court's reliance here on its familiarity with the evidence presented in other cases, when such evidence is not contained in the record in this case, was an abuse of discretion.

The record contains considerable evidence of the child's feelings about going with Franco, and although there is also evidence of difficulties in the child's relationship with Doyle, the evidence as to Doyle does not rise to the same level as

that related to Franco. We recognize, as did the district court, that the child made similar allegations of abuse against both parties, which is concerning. And Sharp testified that the child had nightmares and fear related to the specific events of Doyle's locking him in a closet and his retrieval from school by police in August 2019. Sharp further testified that the child had a panic attack sometime in 2020 after a difficult phone call with Doyle. Franco, likewise, testified that sometimes the child becomes "emotionally affected" by phone calls with Doyle and that the child's demeanor when going on visits with Doyle "fluctuates."

Nevertheless, according to the record, the child did not display the same level of generalized fear of talking to or spending time with Doyle; nor did he repeatedly and consistently throughout the 5 years between entry of the decree and the modification trial refuse to go with her during her parenting time. In fact, the child indicated to Huerta on more than one occasion that he preferred to be with Doyle rather than return to Nebraska with Franco.

The district court found that the child reported to Stankus that the problems he was suffering began with Doyle in California. The court further found that at the time of Stankus' evaluation, the child was suffering from anxiety about Doyle's returning, which caused him to have nightmares and to begin wetting the bed. These findings are contrary to the evidence in the record. Stankus opined not that the child's generalized symptoms of anxiety began when he was with Doyle, but that the apparent conflict between the child and Doyle began when the child was living with her in California. The record shows that the child's problems, including anxiety, nightmares, shutting down, stuttering, and bed-wetting, began during the initial 2-year period he was living with Franco.

Further, Stankus did not testify that the child experienced anxiety about Doyle's returning. Rather, Stankus was questioned as to whether he found any evidence to support a diagnosis of separation anxiety between the child and Doyle or,

in other words, whether the child experienced anxiety about Doyle's not returning. After explaining that separation anxiety occurs when a child experiences a lot of anxiety when the parent is gone and experiences worry, uncertainty, and insecurity about when the parent will return, plus possibly some nightmares or panic attacks, Stankus testified that he did not have any information that would support such a diagnosis for the child relating to Doyle.

Overall, the evidence indicates that the child has a better relationship with Doyle than he does with Franco. According to the child's teacher, Doyle and the child appeared close, and the child became very excited when Doyle would come into the classroom, ran across the classroom and gave her hugs, and cried when she left. The visitation supervisor similarly testified that Doyle and the child appeared to have a close relationship; that they were very engaged, playful, and interactive; that the child sat on Doyle's lap of his own volition; and that they hugged and kissed at each visit. When Sharp first spoke to the child, he told her that he missed Doyle and worried about her general welfare, although Sharp testified that the child was not distressed about needing or wanting to return to California to be with her.

At the time of trial, Sharp was actively working with the child and Franco in family therapy to improve their relationship, including explaining to Franco that locking the child in the basement as a form of discipline is not appropriate. Huerta also worked with the child on improving his relationship and communication with Franco, doing role playing to help him learn to speak with Franco about his wishes, and the goal was that the child's anxiety symptoms would decrease as he developed a better relationship with Franco. Just prior to the Christmas 2018 visit with Franco, the child was angry and upset and expressed to Doyle that he was nervous and felt that Franco would not understand his feelings. On the other hand, Huerta praised Doyle's ability to help the child self-soothe and manage his stress in an effective, healthy way, and the

visitation supervisor testified that when the child was upset, Doyle did what she should have done as his mother, which was attempt to alleviate his concerns.

Upon our de novo review of the record, we also observe that the child's struggles persisted during his initial time with Franco from 2015 through 2017, improved quickly while with Doyle beginning in August 2017, and regressed when he returned to Franco in August 2019. The child had an IEP and was in special education classes and speech therapy while he was with Franco from 2015 until 2017. His main academic concerns at that time were speech, including his becoming frustrated, stuttering, and then shutting down, and his motor skills such as using scissors and pencils, buttoning his pants, and using a zipper. He was also experiencing anxiety, panic attacks, wetting the bed, and having around 10 nightmares per week.

Once the child moved to California in August 2017, Doyle enrolled him in therapy to help with his anxiety and in martial arts to help his self-esteem, encouraged him to be more outgoing with other children, and allowed him to be around his peers outside of school. He made significant progress in school such that by November, he was in mainstream classes with no IEP and was no longer in speech therapy. By that time, Doyle also noticed that he was more outgoing and social, that he was answering questions and participating in class, and that his nightmares and bed-wetting had improved. The child earned several awards in mainstream classes during the 2017-18 school year. He remained in mainstream classes for the 2018-19 school year, continued doing therapy and martial arts, and was engaging with other children.

The child returned to Franco in August 2019, and during that school year, the child again had an IEP, returned to speech therapy, and resumed wetting the bed. For the 2020 school year, he was doing remote learning due to the pandemic, and Franco helped the child sign onto his virtual learning in the mornings and helped with homework. Contrary to the district court's finding that "both [Franco] and his grandmother

assist [the child] with remote learning," Franco testified that his mother does not speak English, that he does not expect her to help the child with remote learning, and that he expected the child, at 9 years old, to be responsible for his own schooling. Franco did not have the child enrolled in any extracurricular activities, even prior to the pandemic.

Franco did, however, begin taking the child to therapy with Sharp in September 2019 and felt that therapy had been beneficial. The information Franco provided to Sharp and Stankus upon which their assessments of the child were based, however, was not entirely accurate. Franco admitted that when providing background information to Sharp at the outset of her providing therapy to the child, he told her that Doyle "had a baby that died inside of her and [that] she escaped from a mental institution." Likewise, Stankus found, in early 2020, based on information provided by the child's teacher, that the child was depressed, withdrawn, pessimistic, and sad. But he testified that the information Franco provided to him did not reflect the child's anxiety and depressed mood and that Franco did not see too many problems except for observing that the child's social relations seemed to be isolated at times.

When discussing the child's stuttering, the district court noted that Franco's first language is Spanish and that Franco's mother, who lives in his home, speaks only Spanish; the court therefore found that it is "unsurprising that a child of such a young age would have difficulties with speech when dealing with learning two languages." There is no evidence in the record to support this conclusion. To the contrary, Stankus explained that stress and anxiety are triggers for stuttering and that he would "[a]bsolutely" expect a person under stress to stutter more.

The evidence presented at trial generally establishes that Doyle historically participated to a greater degree in the child's education than did Franco. When asked at trial the name of the school the child attended from 2015 until 2017 while living with him, Franco could not remember. Doyle

recalled the name of the school, and even though she lived in California, she continued to volunteer in the child's classroom, have lunch with the students, and donate supplies to the school. Although Franco complained to the school about the amount of time that Doyle spent in the classroom, the child's teacher testified that Doyle arranged times with her to come into the classroom when she would not disturb instruction time and that other parents routinely volunteered in the classroom. She explained that encouraging parent participation is part of the philosophy of the kindergarten readiness program that the child was a part of and that the program receives grant money from the federal government based on parent volunteer time.

Doyle also maintained communication with the child's teacher and attended IEP meetings, whereas Franco generally did not respond to communication from the school. When asked why he did not respond to emails from the school, Franco explained that he hardly ever responds to emails, regardless of who sends them, but prefers to take action in person. There was a time the school had an incorrect email address for Franco, but in addition to email, the school also attempted to communicate with him by phone calls, by letters sent home, and through exchange of a notebook, but he rarely responded via any of those methods.

The district court found it "disturbing" that Doyle and the child's teacher arranged for Doyle to be able to speak on the phone with the child during the schoolday. The teacher explained that Doyle contacted her at the beginning of the 2015-16 school year and was upset that she had not been able to speak to the child on the phone in the evenings. Therefore, they arranged for Doyle to call the school at the same time every day, which was during snack time at the end of the day, to be able to speak to the child. The child was very excited when he was able to talk to Doyle on the phone. The district court found it "disturbing" that the teacher never contacted Franco to verify whether he was, in fact, preventing Doyle from speaking to the child or to seek his approval before

making the arrangements. Therefore, the court gave "little weight" to the teacher's testimony. However, the dissolution decree provides that each parent will be able to make phone calls to, or have electronic contact with, the child each day while he is with the other parent, at reasonable times of the day and evening. To the extent Franco was not allowing Doyle to speak to the child on the phone when she would call, he was interfering with her relationship with the child and violating the provisions of the decree.

As noted above, in addition to the statutory "best interests" factors, a court making a child custody determination may consider matters such as the respective environments offered by each parent. See *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). Consideration of this factor weighs in favor of Doyle. She lives in a four-bedroom home with her current husband; her older son, Nathan; and Nathan's girlfriend. Doyle does not work and, thus, is able to volunteer at the child's school, help him with his school work, and take him to therapy appointments and extracurricular activities. The child has his own bedroom at her home, there are neighbor children he has befriended, and Doyle's extended family lives nearby. The school system the child attends in California offers before- and after-school programs and bilingual classes. Doyle's husband testified that he and the child are "buds" and do everything together, including teaching the child to ride a bicycle; playing video games; drawing and coloring; and going to museums, fishing, and camping.

On the other hand, Franco lives in a two-bedroom home with his mother and the child. Franco's mother and the child share a bedroom. Franco owns a plastering company and does exterior plastering work. His work hours vary based on the weather, but in general, he works from 7 a.m. until 5 p.m. In the winter, however, he may work from 9 a.m. until 4 or 5 p.m., and in warmer weather, he will work as late as 9 p.m. if he can. He described the child as "an outdoor kid" who enjoys riding his bicycle and running around with their dogs, and

together, they go fishing and do outdoor activities. The record does not contain evidence regarding any friends or extended family the child has in Nebraska or details about the school he attends.

[12] In assessing the best interests of the child, we also consider the moral fitness and conduct of the parties. Of necessity, the moral fitness and conduct of the parties, along with other matters, are of great significance in determining questions of custody. *Hicks v. Hicks*, 214 Neb. 588, 334 N.W.2d 807 (1983). Here, Franco admitted that he has not filed tax returns for approximately 7 years, claiming that he cannot afford to pay his taxes. He also acknowledged that he claimed a dependent on his tax returns for "some time" even though she is not his daughter. At trial, Franco denied having anger issues or making many of the vulgar comments that are exhibited in the June 2020 recorded phone call, alleging that the last time he made such comments to Doyle was in 2015. When asked whether he thought it was appropriate to call the mother of his child a vulgar name, he said that when he does so, he has his reasons.

The district court placed great weight on Doyle's conduct, interpreting it as her repeatedly denying Franco his parenting time. There was no direct evidence that Doyle intentionally denied Franco parenting time. Rather, Doyle testified that when the child expressed hesitation, reluctance, or fear at going with Franco, she would try to calm him down, encourage him to go, and reassure him that he would have fun, that he would be "okay," and that she would call him while he was gone. She also testified that she made efforts to get the child to call Franco and that she felt that was important "[b]ecause it is his father."

Doyle's husband testified that he never observed Doyle encourage the child not to go with Franco and never observed her speak poorly of Franco. At times when the child complained to Huerta that Franco was "'mean'" and "'rude'" to him, both Huerta and Doyle would encourage him not to be

disrespectful back and, according to Huerta, Doyle "would always remind him, in [Huerta's] presence, that even if somebody's rude to you, you don't have to be rude back." Franco, likewise, did not claim that Doyle discouraged the child from going with him during his visits. And according to Franco, when he asked to pick the child up early for his Christmas 2018 visitation, Doyle said, "[O]f course."

Furthermore, Franco's description of some of the custody exchanges is contradicted by other evidence. For example, he testified that in December 2018, he attempted one time to retrieve the child for his visitation but the law enforcement officers who were present at the exchange asked him for documentation proving that he was permitted to take the child. And when he had no such proof, the officers prevented him from taking the child.

To the contrary, the record includes two reports from the sheriff's department, establishing that law enforcement officers were present for attempted exchanges on December 19 and December 21, 2018. Doyle's husband testified that he arrived home during the attempted exchange on December 19 and observed the officers speak with the child but that the child was afraid and very hesitant to go. Doyle also testified that the officers spent about 30 minutes attempting to convince the child to go with Franco, but that after that time, the parties agreed to take a break and try again. The report from the sheriff's department shows that officers were present for approximately 30 minutes during the attempted custody exchange.

Doyle asserted that Franco, himself, arranged the second attempt, which occurred on December 21, 2018, at the sheriff's department, and that he was the one who requested the presence of law enforcement. The sheriff's report corroborates that the attempt occurred at the sheriff's department on December 21. Doyle testified that the officers talked to Franco, talked to her, and talked to the child, alone, but ultimately brought the child back to her because he did not want to go with Franco. At that point, according to Doyle, Franco

became upset and left, and she did not hear from him again related to that exchange.

Additionally, as discussed above, the evidence clearly proves that exchanges of the child were difficult, at best, and that the child often refused to go with Franco. There were occasions where Doyle was not even present at an attempted exchange and Franco, law enforcement officers, and others still were unable to convince the child to go with Franco. Huerta advised Doyle against physically forcing the child to go with Franco because doing so could be emotionally detrimental for him.

Doyle and her husband testified that they helped the child pack his bags for each visit with Franco and encouraged the child to go and spend time with him. Franco acknowledged that when he first attempted to pick the child up from Doyle in August 2019, he saw the child's bag packed and ready to go. And after the first exchange attempt in August, Doyle sent a text message to Franco telling him that she was able to convince the child to meet and speak with him if she and the child's friend could also attend, which supports her testimony that she tried to convince the child to go on visits with Franco. She also sent Franco a text message the following day asking if he would be willing to meet with her to talk about the child. Franco did not respond to either message. Although the district court found it "highly improbable" that Doyle requested to meet alone with Franco, a copy of the text message was received into evidence at trial, and Franco admitted that he had received the messages but had not responded because he was not willing to meet with Doyle.

Moreover, contrary to the district court's finding that Franco never prevented Doyle from exercising her parenting time with the child, Doyle was scheduled to have visits with the child on June 27 and 28, 2020, but Franco canceled them, after having previously confirmed them with the visitation supervisor and despite the fact that Doyle had already traveled to Nebraska for the visits. In addition, Franco prevented Doyle from talking to the child on the phone during calls the

dissolution decree permitted her to make, and he threatened to block her from calling him and did block her phone number after the recorded call.

In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021). When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

We have conducted a thorough de novo review on the record, reached our own independent conclusions, and given weight to the trial court's factual findings when appropriately supported by the evidence presented at trial. When considering the statutorily required best interests factors and the additional permissible matters, we conclude that the district court abused its discretion in finding that awarding custody to Franco was in the best interests of the child. We therefore reverse the district court's order and remand the cause with directions to award sole legal and physical custody to Doyle subject to Franco's parenting time as set forth in the parenting plan attached to the district court's order. Based on this finding, we do not address Doyle's argument that the court erred in declining to make a less significant change to the parenting plan.

*Contempt.*

Doyle also challenges the district court's decision to hold her in contempt of court. She argues that the court erred in finding her in contempt, in ordering a purge plan with payment amounts that were impossible for her to pay, and in imposing incarceration as part of the contempt proceedings.

[13-15] Civil contempt requires willful disobedience as an essential element. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018). "Willful" means the violation was committed intentionally, with knowledge that the

act violated the court order. *Id*. If it is impossible to comply with the order of the court, the failure to comply is not willful. *Id*. Willfulness is a factual determination to be reviewed for clear error. *Id*. Outside of statutory procedures imposing a different standard or an evidentiary presumption, all elements of contempt must be proved by the complainant by clear and convincing evidence and without any presumptions. *Id*.

With respect to contempt proceedings related to interference with parental visitation, the Nebraska Supreme Court has relied on the custodial parent's conduct and whether the visitation actually occurred. In *Krejci v. Krejci*, 304 Neb. 302, 308-09, 934 N.W.2d 179, 184 (2019), the court upheld the trial court's decision not to hold a parent in contempt for her children's refusal to attend grandparent visitation, stating:

> While we do not endorse the proposition that the responsibility for adhering to a visitation plan devolves to the children, a logical conclusion which results from the district court's findings in this contempt case is that [the mother] did not encourage or instruct the minor children to refuse to participate in the grandparent visitation.

In *Martin v. Martin*, 294 Neb. 106, 881 N.W.2d 174 (2016), the Supreme Court upheld the trial court's determination that a mother was in willful contempt of court because the mother had a consistent pattern of transferring her responsibility to her children and the father was not able to exercise his court-ordered parenting time. In other words, the Supreme Court has affirmed not holding a parent in contempt when that parent did not encourage or instruct the children to refuse the visit, and it has upheld the decision to hold a parent in contempt where that parent consistently transferred the responsibility of deciding whether to attend visitation to the children and the noncustodial parent repeatedly was unable to exercise his court-ordered visitation.

We find the facts of the present case more comparable to *Krejci v. Krejci, supra*, than to *Martin v. Martin, supra*,

and when focusing on the custodial parent's conduct and whether the visitation actually occurred, we conclude that the district court erred in holding Doyle in contempt.

Here, Doyle actively encouraged and tried to convince the child to attend the court-ordered parenting time with Franco; there was no evidence that Doyle ever told the child that he was free to refuse to go with Franco or discouraged him from attending visitation. To the contrary, Doyle testified that when the child expressed to her that he did not want to go with Franco, she would try to calm him down, encourage him to spend time with Franco, remind him of the fun things they would do together, and assure him that she would call him while he was gone. Doyle spoke to Huerta about how to make the exchanges go more smoothly and attempted to utilize the advice he gave her. Doyle and the child were present for each exchange, and Doyle had the child's bag packed and ready for him to go with Franco. Even during the exchange Franco unilaterally arranged in August 2019 at the child's school, when the school notified Doyle, she went to the school with the child's belongings to facilitate the exchange.

There was no testimony from Franco that Doyle discouraged the child from going with him or indicated that he was not going to go; nor did Franco claim that Doyle was not willing to send the child with him. To the contrary, he testified that when he asked to pick the child up early in December 2018, Doyle responded, "[O]f course." Additionally, the text message from Doyle to Franco in August 2019 informing him that she was able to convince the child to meet with him supports her claims that she actively encouraged and attempted to persuade the child to go with Franco.

The evidence establishes that despite Doyle's encouragement, the child was very reluctant to go, and frequently adamantly opposed to going, with Franco. Huerta opined that physically forcing the child to go with Franco was not in his best interests and could be emotionally damaging for him.

Thus, while we recognize that the responsibility for adhering to a visitation plan does not and should not devolve to the children, considering that Doyle encouraged the child to go, enrolled the child in therapy where the therapist worked with him on going with Franco, and transported him and his belongings to each exchange while attempting to convince him to go with Franco, the clear and convincing evidence does not establish that Doyle intentionally violated the court's order.

Moreover, Franco's application for contempt enumerates specific visitation periods. Of those, he acknowledges that he did not travel to California to attempt to retrieve the child in the spring of 2018 or the spring of 2019. And the child ultimately returned to Franco in August 2019. Therefore, when considering whether the visitation actually occurred, it cannot be said that Franco was deprived of parenting time on the occasions where the visit actually took place.

[16] The remaining parenting time of which Franco was deprived was Christmas break 2018. As explained above, the credible evidence establishes that the parties attempted the exchange on both December 19 and December 21. On each day, Doyle presented the child and his packed bag and encouraged him to go; however, Doyle, her husband, Franco, and law enforcement officers were all unable to convince the child to go with Franco. We do not find that this sole instance where Doyle did not instruct the child not to go with Franco constitutes willful disobedience of a court order. Accordingly, the district court erred in holding Doyle in contempt, and we reverse its decision in this regard. We therefore need not address the issues Doyle raises related to the purge plan and imposition of incarceration as part of the civil contempt proceedings. See *Applied Underwriters v. S.E.B. Servs. of New York*, 297 Neb. 246, 898 N.W.2d 366 (2017) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

## CONCLUSION

For the foregoing reasons, we affirm the district court's finding of a material change in circumstances affecting the best interests of the child. We reverse its decision to award sole legal and physical custody to Franco and remand the cause with directions to award sole custody to Doyle, subject to Franco's parenting time. We also reverse the court's decision to hold Doyle in contempt.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.