IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


JACQUELINE E. V. RYAN E.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


JACQUELINE E., APPELLANT,

V.

RYAN E., APPELLEE.


Filed July 5, 2022.    No. A-21-800.


Appeal from the District Court for Douglas County: THOMAS A. OTEPKA, Judge. Affirmed.

Stephanie Weber Milone, of Milone Law Office, for appellant.

Christopher A. Vacanti and William L. Finocchiaro, of Vacanti Shattuck, for appellee.


MOORE, RIEDMANN, and ARTERBURN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Jaqueline E. appeals from the order of the district court for Douglas County, which modified the decree dissolving her marriage to Ryan E. On appeal, Jacqueline asserts that the court erred in various regards, including modifying custody, making certain determinations with respect to child support, and failing to award her attorney fees. Finding no abuse of discretion, we affirm.

## II. STATEMENT OF FACTS

Jacqueline and Ryan were married in June 2001. They are the parents of Gavin, born in 2003; Kiersten, born in 2005; and Logan, born in 2009. We note that Gavin has reached the age of majority since entry of the modification order in this case and any issues with respect to his custody and the parties' parenting time with him have become moot. Accordingly, we have discussed evidence with respect to Gavin only to the extent of its relevance to our analysis of issues concerning Kiersten and Logan.

- 1 -

The district court entered a decree dissolving the parties' marriage on May 9, 2019 and awarding the parties joint legal and joint physical custody of the children. The decree provided for parenting time on a rotating 2-week schedule, and the court ordered Jacqueline to pay child support of $212 per month for three children, $194 per month for two children, and $151 for one child. The court found, based on the parties' agreement, that individual and/or family therapy was "prudent and necessary to address divorce trauma and family dysfunction" and that each member of the family should participate in some form of therapy "to improve inter-family dynamics." The parties' obligation to pay for nonreimbursed health care costs incurred for the children was allocated with Jacqueline being ordered to pay 54 percent and Ryan to pay 46 percent. The partial parenting plan negotiated by the parties through mediation was approved by the court and attached to the decree. Also, attached to the decree was the court's child support worksheet, utilizing total monthly incomes of $20,000 for Jacqueline and $16,666.67 for Ryan.

On March 17, 2020, Ryan filed a complaint for modification, seeking sole legal and sole physical custody of Gavin. Ryan alleged there had been a material change in circumstances since the entry of the decree due to the deterioration of Gavin's relationship with Jacqueline, Gavin's refusal to spend any time with Jacqueline and to follow Ryan's instructions to comply with the court-ordered parenting time schedule, Ryan's inability to force Gavin to comply, and the fact that Gavin had been living exclusively with Ryan since January 22.

On June 29, 2020, Ryan filed an amended complaint for modification, seeking sole legal and sole physical custody of all three children. In addition to his previous allegations with respect to Gavin, Ryan alleged a material change in circumstances due to the deterioration of Kiersten's relationship with Jacqueline; Kiersten's refusal to spend time with her; and Kiersten's concerns about Jacqueline's new boyfriend, a gun Kiersten discovered in Jaqueline's home, the "livable condition" of Jacqueline's residence, and Jacqueline's behavior toward Kiersten. Finally, Ryan alleged that Gavin and Kiersten were both of sufficient age and maturity to voice their desires regarding custody and parenting time with each parent and that Logan was of sufficient age and maturity to give evidence about Jacqueline's parenting and the condition of her residence.

Jacqueline filed an answer to the amended complaint and a counterclaim, denying the material changes in circumstances alleged by Ryan, alleging that Ryan's modification action was frivolous and/or made in bad faith and/or for the purpose of harassing her, and seeking sole legal and sole physical custody of the children due to a lengthy list of alleged material changes in circumstances.

Although not included in the record of the present appeal, we note that Jacqueline has filed multiple contempt applications since Ryan initiated the modification proceedings, in which she set forth a plethora of alleged violations by Ryan of the decree and parenting plan pertaining to custody and parenting time and the parties' rights, responsibilities, and obligations. Three of those contempt applications were heard by the district court in August 2020. Jacqueline appealed from the district court's denial of those applications, and this court affirmed in a memorandum opinion filed on April 6, 2021. See *Jacqueline E. v. Ryan E.*, No. A-20-740, 2021 WL 1259167 (Neb. App. Apr. 6, 2021) (selected for posting to court website).

Trial in the modification proceedings was held on June 30 and July 1, 2021. The district court heard testimony from the parties, Gavin and Kiersten, Ryan's former fiancée, and Jacqueline's boyfriend. The court also received various documentary exhibits into evidence,

including numerous text and email communications between the parties, income tax returns, bank statements, pay stubs, proposed child support calculations, certain therapy records, reports of Gavin's and Kiersten's grades, photographs of a gun found by Kiersten in Jacqueline's residence, and an attorney fee affidavit from Jacqueline's attorney.

Both Gavin and Kiersten testified about the deterioration of their relationships with Jacqueline, and the evidence shows that all three children stopped attending parenting time with Jacqueline and lived primarily with Ryan for certain periods following entry of the decree. Gavin lived primarily with Ryan beginning sometime in January 2020. He testified that he had a good relationship with Ryan and preferred living at Ryan's house, where he felt "less controlled," had "more free time," and where he felt like he was given "more trust." Gavin testified that on occasions when he had missed school assignments, Ryan discussed the issue with him and would follow through with further action (such as taking away Gavin's gaming system, keys, or phone) if talking did not produce results. He expressed concern about the temperature at which Jacqueline maintains her residence, and her use of profanity when communicating (even in the presence of Logan). Gavin had just graduated from high school, receiving mostly As and Bs in the preceding school year, while taking "some AP classes." He received a score of 31 on his ACT exam. Gavin was enrolled to attend college at the University of Nebraska-Lincoln in the fall and was planning to live in the dorms and major in business. At the time of his testimony he was working at a full-time landscaping job and had also maintained part-time employment at a grocery store for almost 2 ½ years. His extracurricular activities during high school included football, basketball, and baseball.

Kiersten began living exclusively with Ryan in April 2020, shortly after discovering a gun in Jaqueline's residence. She continued to do so at the time of trial although she had resumed some activities with Jaqueline (such as swimming at the residence with Jacqueline and Logan) and had discussed plans for a summer vacation. In addition to her discovery of the gun, Kiersten's concerns about living with Jacqueline include the temperatures at which Jacqueline maintains her residence (uncomfortably warm in summer and cold in winter) and issues in communicating productively with Jaqueline. Kiersten had just completed the tenth grade at the time of her testimony, and the record reflects that her grades for the school year had been As, except for a B in chemistry during the second semester. At the time of her testimony, Kiersten had never been in trouble "with the law" or at school and was employed at three different jobs. She also played softball. Kiersten testified that she would like to continue residing primarily with Ryan, but she stated that she would like to have "a better and a reciprocal relationship," with Jacqueline.

Logan began living primarily with Ryan shortly after Kiersten did so, but by the fall of 2020 had returned to the parenting time schedule set forth in the decree. During trial, Ryan withdrew his request for sole legal and sole physical custody of Logan, and he stated that he was only asking for legal and physical custody of Gavin and Kiersten.

There was considerable evidence at trial devoted to the gun incident, and while we do not repeat all the evidence here, the record generally reflects an ongoing concern in the communications between the parties and in Kiersten's relations with her mother with respect to Jacqueline's responses, or lack thereof, to Ryan's and Kiersten's inquiries about the gun. The evidence shows that Ryan and Kiersten have sought acknowledgement from Jacqueline of the gun's existence and some form of future safety plan regarding this particular gun, or any other

guns that might be brought into the residence. Jacqueline generally has denied that the gun was left out and visible on the kitchen counter in her residence.

At trial, Kiersten expressed frustration that Jacqueline has never admitted to her "that there was a gun there." The pictures of the gun admitted into evidence show it in a clear wrapping, laying directly on what appears to be a counter. Kiersten denied moving the gun to take a better picture of it; something she had previously testified to doing. Ryan denied asking Kiersten to photograph the gun or search through the possessions of Jacqueline's boyfriend. Jacqueline denied ever seeing the gun or that it had been left directly on her kitchen counter.

Jacqueline's boyfriend, the owner of the gun, testified that, on the day in question, the gun had been packed in the bottom of a "double thickness" plastic shopping bag with some of his other personal belongings. He testified that the bag had been tied shut and that he had placed the bag on the kitchen counter with his wallet and phone on top before taking a walk with Jacqueline. According to the boyfriend, the bag, its contents, and his phone and wallet were in the same position when they returned from their walk, although he indicated that, when he checked later, some items in his wallet were in different locations from where he normally keeps them. The boyfriend has a concealed carry permit, and he testified that he generally carries the gun with him, "except for prohibited areas," but that, at Jacqueline's request, he no longer brought it to her residence.

Another significant issue at trial was the parties' compliance with the counseling provision of the decree. No therapy has occurred with the entire family present. Both Ryan and Jacqueline testified about their participation in individual counseling since entry of the decree. Logan and Gavin have also both received some counseling sessions. Kiersten has attended counseling with three separate therapists. The first therapist saw Kiersten between April 2019 and May 2020 and had opportunities to meet with the parties as well. Notes from one therapy session reflect that Kiersten "did an excellent job ultimately of expressing herself, but that Jacqueline "struggled some with implementing appropriate reciprocal skills." Kiersten testified that this was reflective of the challenges she has had in her relationship with Jacqueline. Kiersten attended a counseling session with another therapist in November 2020 (first 20 minutes of the session included Jacqueline). Kiersten was frustrated that further sessions were not scheduled with the second therapist. She subsequently began counseling with a third therapist, whom she had seen for 10-12 sessions (which only included Kiersten). Kiersten found these sessions useful, but by the time of trial that therapist was moving and could no longer provide therapy for Kiersten. She testified that she would like to be involved with another therapist so she could continue to work on issues in her relationship with Jacqueline.

Numerous text and email exchanges between the parties were received into evidence, and while we do not repeat the content of those messages here, or the testimony about them, it is clear that the parties have difficulty in communicating effectively with one another. As relevant to the issues on appeal, the record reflects their disputes with respect to payment for the children's counseling services and to the selection of new therapy providers for Kiersten at various points.

Ryan testified to his belief that it was in the children's best interests for Gavin and Kiersten to be in his legal and physical custody and for Logan's custody to remain as in the decree. When Ryan was asked why he thought that he "should be the sole decision-maker for Gavin," he replied, "I just think that the decisions are better off with me than both [Jacqueline and I], 'cause we don't

agree on anything." With respect to Gavin's physical custody, Ryan testified that he felt Gavin was "in a healthy environment" at Ryan's house and did not enjoy living at Jacqueline's house. Ryan also testified that he did not feel Jacqueline was "fit" to make fundamental decisions for Kiersten because Jacqueline "yells at the kids," "brings a gun into the house," and refuses to take responsibility for it, and does not want to address the gun issue with Kiersten. And with respect to modifying custody for the older children, but not Logan, Ryan testified Logan was "a well-adjusted kid" and had not confided any problems when discussing with Ryan "what has happened in the past year." Jacqueline testified, however, the custody modifications sought by Ryan at trial were "absolutely not" in the children's best interests because of Ryan's tendency to make unilateral decisions and need "to control everything." She also testified, "There's been just been a lot of triangulation and parental alienation going on for years." Finally, she testified that Logan is lonely since resuming parenting time with her.

Ryan's former fiancée testified about an altercation between herself and Ryan. She began dating Ryan in April 2018, after the parties separated, and she and her two daughters lived with Ryan and his children between March and November 2020. The altercation occurred sometime in the fall of 2020. She testified that she and Ryan "were not getting along that day, got into an argument," and that the argument became physical in that Ryan "had shut the door on [her] to get [her] into another room." She testified that she was injured by this, took photographs of her injuries, and sent Jaqueline some text messages during and after the altercation. The former fiancée did not know if Gavin and Logan were home during the argument, but she testified that Ryan asked Kiersten to video the argument. Ryan called the police to come to the residence. The former fiancée testified that this incident was the only time a physical altercation occurred between her and Ryan. During the course of her relationship with Ryan, the former fiancée observed Ryan to be a good and loving parent to his children, but she expressed concern about the relationship between Kiersten and Jacqueline. Ryan's and Kiersten's testimony about the physical altercation was generally consistent with that of Ryan's former fiancée.

Another concern, alluded to in both the testimony of Jacqueline and Ryan's former fiancée, was Ryan's possible use of illegal drugs. Several witnesses also testified about a hand gesture Ryan made toward Jacqueline and her boyfriend during one of Gavin's football games; the witnesses variously interpreted the gesture, or Ryan's actions before making the gesture, as referring to "mocking shooting [them]," evidence of his "appear[ing] to be high as a kite on cocaine," or a reference to Jacqueline's and her boyfriend's failure to acknowledge the presence of the gun at her residence. When asked at trial, Ryan denied being "under the influence of any illegal substances" on that occasion; he also denied ever using cocaine, having "abused any illegal substances" since entry of the decree, or ever having "sold illegal substances out of [his] business location." Jacqueline also referenced Ryan having "three DUIs" and having been "in an out of jail." However, Ryan was not asked about these issues, and Jacqueline provided no further evidence beyond the above-referenced statements.

There was evidence about Ryan's income and employment in the period since entry of the decree. Ryan is a meat wholesaler, selling meat to restaurants. Ryan testified the COVID-19 pandemic had a "huge impact" on his business, and that accordingly, his 2020 income is probably lower than it would have been otherwise and his 2019 income is a more accurate reflection of what

he would have earned in 2020. Ryan is a 100 percent shareholder in his business, which is an S-corporation.

Ryan's Schedule K-1 forms from his corporate tax returns reflect "[o]rdinary business income" for 2019 of $69,851 and for 2020 of $44,454. We note that the Schedule K-1 included with his 2020 individual income tax return reflects "[o]rdinary business income" for 2020 of $52,869. His individual tax returns reflect "total income" of $131,295 for 2019 and $73,914 for 2020.

Ryan testified that his individual income tax returns for 2019 and 2020 account for all of his "personal income" for those 2 years and that the "total income" amount shown included his wages ($50,000 for 2019 and $25,000 for 2020) as well as any distributions he received from his business. He also testified that if he uses his business account to pay for expenses for the children, he claims that amount as income.

Ryan contributes $1,000 a month to a "SEP-IRA" retirement account, testifying that he was able to contribute that amount in 2020 and was continuing to do so.

On August 18, 2021, the district court entered an order modifying the parties' decree. The court found that there had been a material change in circumstances, in that Jacqueline's relationship with Gavin and Kiersten had deteriorated in ways that could not have been contemplated at the time the decree was entered. The court further found that Jacqueline's efforts in complying with the family counseling provision of the decree were not what the court contemplated at the time the decree was entered. The court also concluded that there had been a material change of circumstances with respect to custody, child support, and other financial obligations of the parties, warranting modification as specifically provided in the court's order.

With respect to custody, the district court found that, after application of the factors set forth in Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) and relevant case law:

a. The relationship of Gavin and Kiersten with [Jacqueline] has deteriorated since entry of the [decree];

b. The relationship of Gavin and Kiersten with [Ryan] has continued to strengthen to the point where the children feel more safe, secure, and loved while in [his] care;

c. Gavin and Kiersten, both being of sufficient age and maturity emphatically expressed their desire to live primarily with [Ryan]. Gavin and Kiersten both excelled scholastically and socially over the last year while living primarily with [Ryan];

d. The general health, welfare, and social behavior of the children has improved in the last year while Gavin and Kiersten primarily lived with [Ryan]; and

e. The children's ability to live without the chaos and conflict in [Jacqueline's] home over the last year has been beneficial to them and for them to continue living primarily with [Ryan] is in their best interests.

The court concluded that the best interests of the children would be served by Ryan having sole legal and physical custody of Gavin and Kiersten, and the parties continuing to share joint legal and physical custody of Logan, subject to each parties' parenting time as set forth in the order.

The district court found that the parties' parenting time with Logan should remain as set forth in the decree, unless otherwise agreed to between the parties, and that any parenting time between Jacqueline and Gavin should be as agreed to between her and Gavin due to his age (18 at

the time) and plan to start college. The court ordered parenting time between Jacqueline and Kiersten every Wednesday after school until returning to school the following morning (or from 4 p.m. Wednesday until 8 a.m. Thursday, if no school) and on alternating weekends from noon on Saturday until noon on Sunday. The court ordered that Jacqueline's holiday and vacation parenting time with Kiersten remain as set forth in the decree. Additionally, the court terminated the counseling provision found in the decree and ordered Jacqueline and Kiersten to participate in joint counseling sessions for a minimum of eight sessions in an effort to repair their relationship.

Next, the district court addressed the changes in child support necessitated by its modification of custody. The court observed that this case does not fall squarely into a sole, joint, or split custody calculation, making some sort of "hybrid calculation" appropriate. The court adopted the methodology set forth in the child support calculation offered by Ryan at trial, finding it to be "fair, reasonable and in the best interests of the parties' minor children." First, the court completed child support worksheets reflecting both a basic income and support calculation and a joint physical custody calculation, utilizing an income or earning capacity for Jacqueline of $17,250 per month and for Ryan of $10,941. The court allowed Ryan a deduction of $437.65 (4 percent of his income) for his contribution to his retirement plan. The basic income and support calculation yielded a child support obligation for Jacqueline of $1,983 for three children, $1,683 for two children, and $1,162 for one child. The joint physical custody calculation yielded a support obligation for Jacqueline of $433 for three children, $358 for two children, and $226 for one child. Then the court calculated Jacqueline's total child support obligation, by applying the following methodology to the numbers from the worksheets:

Three Minor Children

| | |
|---|---|
| Obligation for G. & K. (66.67% of $1,983) | $1,322.00 |
| Obligation for Logan (33.33% of $433) | $144.00 |
| Jacqueline's total obligation | $1,466.00 |

Two Minor Children

| | |
|---|---|
| Obligation for Kiersten (50% of $1,683) | $841.50 |
| Obligation for Logan (50% of $358) | $179.00 |
| Jacqueline's total obligation | $1,020.50 |

One Minor Child

| | |
|---|---|
| Obligation for Logan | $226.00 |
| Jaqueline's total obligation | $226.00 |

Accordingly, the court found that Jacqueline's support obligation should be $1,466 for three children, $1,020.50 for two children, and $226 for one child, beginning the first day of the first month following entry of the court's order.

Finally, the district court allocated the parties' responsibility for nonreimbursed health care expenses for Gavin and Kiersten, ordering Jaqueline to be responsible for 60 percent of these expenses and Ryan for 40 percent, after Ryan's payment of the first $250 per child per year. The court's order was silent on the issue of attorney fees.

On September 10, 2021, the district court entered an order ruling on a motion to alter or amend filed by Jacqueline. The court stated that it was amending the modification order to include a finding that Neb. Rev. Stat. § 43-2932(1) (Reissue 2016) applied because a preponderance of the

evidence demonstrated that Ryan and his former fiancée were involved in domestic intimate partner abuse as defined by Neb. Rev. Stat. § 42-903 (Cum. Supp. 2020). Pursuant to § 43-2932(3), the court made "special findings that no action is required to adequately protect the children from harm." The court further amended the modification order to state that any request for relief by any party not specifically granted in the modification order was denied. The court made other findings not relevant to the issues on appeal, and it concluded its September 10 order by stating that it would enter an amended modification order incorporating its findings.

On September 10, 2021, the district court entered the amended modification order, followed by an order nunc pro tunc which incorporated the court's previous child support calculation worksheets from the original modification order that had not been attached to the amended modification order. Jacqueline subsequently perfected her appeal to this court.

## III. ASSIGNMENTS OF ERROR

Jacqueline asserts, consolidated and restated, that the district court erred in (1) awarding Ryan sole legal and physical custody of Kiersten and failing to award Jacqueline sole legal custody of Kiersten and Logan, (2) finding no necessity to protect the children from harm due to Ryan's domestic violence, (3) changing regular parenting time with Kiersten, (4) limiting its order with respect to counseling to only eight joint counseling sessions between Jacqueline and Kiersten, (5) determining Ryan's earning capacity, (6) allowing Ryan a deduction for a retirement plan contribution in the child support calculation, (7) using a hybrid child support calculation, (8) allocating to Jacqueline 60 percent of the nonreimbursed health care expenses for the children, and (9) failing to award Jacqueline attorney fees. Jacqueline also assigned error to the court's determinations of custody and parenting time with respect to Gavin. Since Gavin has reached the age of majority, the issue of his custody and the parties' parenting with him is moot, and we only consider whether the court abused its custody determinations with respect to Kiersten and Logan as reflected in the assigned errors stated above.

## IV. STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, parenting time, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion. See *Keiser v. Keiser*, 310 Neb. 345, 965 N.W.2d 786 (2021). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Grothen v. Grothen*, 308 Neb. 28, 952 N.W.2d 650 (2020).

In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021). However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than the other. *Keiser v. Keiser, supra*.

In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Buderus v. Buderus*, 30 Neb. App. 589, 971 N.W.2d 359 (2022).

## V. ANALYSIS

### 1. CUSTODY

Jacqueline asserts that the district court erred in modifying the decree to award Ryan sole legal and physical custody of Kiersten. She separately asserts that the court erred in failing to award her sole legal custody of "the children," which given Gavin's current age, we interpret to mean "sole legal custody of Kiersten and Logan."

Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). Modifying a custody or parenting time order requires two steps of proof. *Id.* First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id.* Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id.*

Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently. *Id.* The party seeking modification of child custody bears the burden of showing as an initial matter that there has been a change in circumstances. *State on Behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015).

Under the Parenting Act, the requirements for a child's best interests include "[a] parenting arrangement and parenting plan or other court-ordered arrangement which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children." 43-2923(1). Additionally, § 43-2923(6) sets forth a non-exhaustive list of factors to be considered in determining the best interests of a child in regard to custody, including:

> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

With respect to the child's preference, the Nebraska Supreme Court has stated that the wishes of a child are not controlling in determinations of child custody. *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020). If a child is of sufficient age and has expressed an intelligent preference regarding child custody, the child's preference is entitled to consideration, alongside

other factors. *Id.* The amount of consideration given to a child's stated preference regarding child custody will depend on the child's age and ability to give reasons for his or her preference. *Id.* In child custody cases where the minor child's preference was given significant consideration, the child was usually over 10 years of age. *Olson v. Olson*, 27 Neb. App. 869, 937 N.W.2d 260 (2019).

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Rodas v. Franco*, 30 Neb. App. 910, 974 N.W.2d 856 (2022).

In its modification order, the district court found that a material change in circumstances had occurred since the entry of the decree which warranted modifying custody to award Ryan sole legal and sole physical custody of Kiersten and that such a change was in Kiersten's best interests. However, the court found it in Logan's best interests for the parties to continue sharing his joint legal and joint physical custody. The material changes in circumstances identified by the court were the deterioration of Jacqueline's relationships with Gavin and Kiersten and Jacqueline's efforts in complying with the family counseling provision of the decree. On appeal, Jacqueline does not challenge the court's finding of a material change in circumstances, but she argues that the changes in legal and physical custody were not in the children's best interests.

Upon our de novo review, we find no abuse of discretion in the district court's decision modifying the decree to award Ryan sole legal and physical custody of Kiersten or in denying Jaqueline's request for sole legal custody of Kiersten and Logan.

With regard to legal custody, the parties here have considerable and increasing difficulty in communicating effectively with one another and in their ability to make joint decisions concerning the children. Courts typically do not award joint legal custody when the parties are unable to communicate effectively. See, *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009) (joint decisionmaking by parents not in child's best interests when parents are unable to communicate face-to-face and there is level of distrust).

With regard to physical custody, the record reflects that Kiersten and Jacqueline's relationship deteriorated since the entry of the decree, and they have continued to have a strained relationship and difficulty communicating, although they have recently begun to engage in more activities together. Kiersten, age 16 at the time of the modification trial, expressed a clear preference to live primarily with Ryan. She has done well academically and socially while living primarily with Ryan.

While the court's modification sets up a differing custody relationship for Kiersten than for Logan, the court clearly considered all of the evidence, including the fact that the record does not reflect the kinds of issues for Logan with either parent as it does for Kiersten (and Gavin) with Jacqueline. Under the circumstances presented here, we find no abuse of discretion. Jacqueline's assignments of error with respect to the modification of legal and physical custody fail.

## 2. ALLEGATIONS OF DOMESTIC VIOLENCE

Jacqueline asserts that the district court erred in finding no necessity to protect the children from harm due to Ryan's domestic violence. In the amended modification order, the court found that 43-2932(1) applied because a preponderance of the evidence demonstrated that Ryan and his former fiancée were involved in domestic intimate partner abuse as defined by § 42-903. However, pursuant to § 43-2932(3), the court made "special findings that no action [wa]s required to adequately protect the children from harm."

When a court is required to develop a parenting plan, § 43-2932(1) allows the court to place limits on parenting time or other access for a parent in cases where a parent is found by a preponderance of the evidence to have committed domestic intimate partner abuse or other specified acts. In such instances, the court shall impose limits reasonably calculated to protect the child or child's parent from harm. And, if a court determines that a parent has engaged in any of these acts, the court shall not order legal or physical custody to be given to that parent without making special written findings that the child and other parent can be adequately protected from harm by such limits as it may impose. § 43-2932(3).

Ryan does not contest the finding that he engaged in "[d]omestic intimate partner abuse" as defined in Neb. Rev. Stat. § 43-2922(8) (Cum. Supp. 2020), and we need not discuss this finding further. However, we do note that there was no showing of a pattern or history of such acts of abuse by Ryan. Rather, there was evidence of one altercation between Ryan and his former fiancée. We also consider the former fiancée's testimony that Ryan is a good father. Jacqueline references other concerns in her brief (alleged drug use, gestures at football game), but we disagree that these constitute domestic intimate partner abuse or, when considered together with the incident between Ryan and his former fiancée, represent a pattern or history of similar acts.

While it is certainly concerning that Kiersten witnessed, or the other children may have witnessed, the incident in question, under the circumstances presented here, we find no abuse of discretion in the court's determination that no action was required to adequately protect the children from harm.

## 3. PARENTING TIME

Jacqueline asserts that the district court erred in changing her regular parenting time with Kiersten. She argues that the court "[w]ithout explanation" severely limited her regular parenting time with Kiersten. Brief for appellant at 33. She argues further that at the time of trial, she and Kiersten were getting along well and had resumed certain activities together.

Under the decree, the parties were awarded joint physical custody of Kiersten, and Jaqueline had regular parenting time with her from Wednesday at 9 a.m. until Friday at 9 a.m. and every other weekend from Friday at 9 a.m. until Monday at 9 a.m. The district court modified the decree to award Ryan sole physical custody of Kiersten. It modified the decree to award Jacqueline regular parenting time with Kiersten every Wednesday from after school (or 4 p.m. if no school) until Kiersten returns to school the following morning (or 8 a.m. if no school) and on alternating weekends from Saturday at noon until Sunday at noon. The court did not modify the schedule of holiday and vacation parenting set forth in the decree.

The right of parenting time is subject to continual review by the court, and a party may seek modification of a parenting time order on the grounds that there has been a material change

in circumstances. *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021). Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent. *Anderson v. Anderson*, 27 Neb. App. 547, 934 N.W.2d 497 (2019). The best interests of the children are the primary and paramount considerations in determining and modifying parenting time. *Olander v. McPhillips*, 28 Neb. App. 559, 947 N.W.2d 578 (2020).

The evidence shows that following entry of the decree, the relationship between Jacqueline and Kiersten deteriorated to the point that Kiersten began living exclusively with Ryan near the end of March or beginning of April 2020, and she refused to attend parenting time with Jacqueline for a period of time. There had been some improvement in their relationship by the time of trial, and Kiersten was willing to continue with counseling to try to strengthen her relationship with Jacqueline; however, she expressed her wish to continue living primarily with Ryan.

The district court's modification of the parenting time schedule between Jacqueline and Kiersten is grounded in its modification of custody, which we have found was not an abuse of discretion. Despite some improvement in the relationship between Jacqueline and Kiersten, their relationship was clearly still strained at the time of the modification trial. Although the modified parenting time schedule is somewhat more restrictive than what is sometimes awarded in cases in which one parent is awarded sole physical custody, we do not find it to be an abuse of discretion under the particular facts of this case. This assignment of error fails.

### 4. COUNSELING

Jacqueline asserts that the district court erred in limiting its order with respect to counseling to only eight joint counseling sessions between Jacqueline and Kiersten. At the time of the divorce decree, the court found that each member of the family should participate in some form of therapy to improve inter-family dynamics and entered certain provisions relating to that finding. In the modification order, the court terminated the portion of the decree relating to counseling requirements and ordered Jacqueline and Kiersten to participate in a minimum of eight joint sessions in an effort to repair their relationship.

The record is clear that at least a portion of the counseling sessions that occurred for family members following entry of the decree were interrupted for various reasons, including changes in service providers and disputes between the parties with respect to payment. As relevant here, the record shows that Gavin is no longer a minor and Logan has resumed a relationship with Jacqueline, while the relationship between Kiersten and Jacqueline is still strained. Significantly, it does not appear that any joint counseling sessions between Kiersten and Jacqueline have yet occurred. The court's order of a minimum of eight joint counseling sessions between Kiersten and Jaqueline is appropriate, and there is nothing preventing them from continuing beyond eight sessions if they feel that it is necessary. Likewise, if difficulties develop in the relationship between Jacqueline and Logan, there is nothing preventing the parties from seeking counseling in aid of improving the relationship at that point in time. While it may be beneficial for the family members to each continue in individual counseling or to engage in joint counseling sessions involving more family members than just Jaqueline and Kiersten, we find no abuse of discretion in the court's limiting its order with respect to counseling to a minimum of eight joint sessions between Jacqueline and Kiersten.

## 5. CHILD SUPPORT ISSUES

Jacqueline assigns several errors relating to the district court's calculation of child support. She asserts the court erred in determining Ryan's earning capacity, allowing him a deduction for a retirement plan contribution in the child support calculation, using a hybrid child support calculation, and allocating to Jacqueline 60 percent of the nonreimbursed health care expenses for the children.

A party seeking to modify a child support order must show a material change in circumstances that (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered. *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020). The party seeking the modification has the burden to produce sufficient proof that a material change of circumstances has occurred that warrants a modification and that the best interests of the child are served thereby. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). Among the factors to be considered in determining whether a material change of circumstances has occurred are changes in the financial position of the parent obligated to pay support, the needs of the children for whom support is paid, good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent. *Id.* The paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child. *Id.*

### (a) Ryan's Earning Capacity

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). Neb. Ct. R. § 4-204 (rev. 2020) provides in relevant part:

> (A) Total monthly income is the income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages. This would include income that could be acquired by the parties through reasonable efforts. For instance, a court may consider as income the retained earnings in a closely-held corporation of which a party is a shareholder if the earnings appear excessive or inappropriate. . . .
>
> . . . .
>
> (E) If applicable, earning capacity may be considered in lieu of a parent's actual, present income. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources. When imputing income to a parent, the court shall take into consideration the specific circumstances of the parents, to the extent known. Those factors may include the parent's residence, employment and earnings history, job skills, educational attainment, literacy, age, health, and employment barriers, including criminal record, record of seeking work, prevailing local earning levels, and availability of employment.

Use of earning capacity to calculate child support is useful when it appears that the parent is capable of earning more income than is presently being earned. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). However, earning capacity should be used to determine a child support

obligation only when there is evidence that the parent can realize that capacity through reasonable efforts. *Id.*

Jacqueline argues that the district court should have continued to utilize Ryan's income as reflected in the initial decree of dissolution and determine that income to be his present earning capacity. However, it was clearly necessary to adjust the child support obligations given the modification of custody. In determining the modified support, the court used evidence of the parties' current income. The income figure of $17,250 used by the court for Jacqueline was the income suggested for her by both parties in their proposed calculations, is consistent with the evidence about her income received at the modification trial, and is less than the $20,000 income that was used for her at the time of the decree. Ryan's individual tax returns reflect that his "total income" in 2019 averaged approximately $10,941.25 per month and $6,159.50 per month in 2020. Ryan testified that his income in 2020 was significantly affected by the COVID-19 pandemic and that his 2019 income was more reflective of what he would have earned absent the pandemic. The district court adopted the child support worksheet submitted by Ryan utilizing a gross earned taxable income of $10,941.25. Upon our de novo review, under the particular circumstances of this case, we find that the court did not abuse its discretion in calculating Ryan's income for purposes of child support.

### (b) Retirement Plan Contribution

In its child support calculation, the district court allowed Ryan a deduction of $437.65 for his retirement plan contribution (an amount that is 4 percent of the gross income figure of $10,941.25 the court used for Ryan). In calculating child support, a parent may receive a deduction for contributions to a retirement plan. *Drabbels v. Drabbels*, 25 Neb. App. 102, 902 N.W.2d 705 (2017). Pursuant to Neb. Ct. R. § 4-205 (rev. 2016), the guidelines allow a deduction for "[i]ndividual contributions, in a minimum amount required by a mandatory retirement plan" and "[w]here no mandatory retirement plan exists, a deduction shall be allowed for a continuation of actual voluntary retirement contributions not to exceed 4 percent of the gross income from employment or 4 percent from the net income from self-employment." § 4-205(C).

Ryan testified that he contributes to a "SEP-IRA" retirement account and that he contributed $1,000 a month to this account throughout 2019 and 2020 and continued to contribute that amount in 2021. He testified further that this amount is taken out of his personal bank account at a particular bank and confirmed that he previously responded to interrogatories that he contributes $1,000 per month to a particular identified "SEP-IRA." Statements for Ryan's personal bank account were received into evidence (for dates between June 2019 and April 2020) and reflect monthly withdrawals of $1,000 for "UBS FINSVC EFT", which Ryan testified reflected his retirement plan contribution.

Jacqueline argues that Ryan's evidence was insufficient to allow such a deduction from his gross monthly income in the child support calculation. She essentially challenges the credibility of his evidence. However, the district court clearly found Ryan's evidence credible, and we defer to its judgment in that regard. See *Keiser v. Keiser*, 310 Neb. 345, 965 N.W.2d 786 (2021) (when evidence is in conflict, appellate court considers and may give weight to fact that trial court heard and observed witnesses and accepted one version of facts rather than other). This assignment of error fails.

- 14 -

(c) Other Child Support Related Arguments

Jacqueline also asserts that the district court erred using a hybrid child support calculation and in its allocation of the nonreimbursed health care expenses for the children. Her arguments in support of these assigned errors are dependent on her assertion that the court erred in changing physical custody of Kiersten. Given our finding with respect to Kiersten's physical custody, we need not address Jacqueline's other child support-related arguments further. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Nebraska Republican Party v. Shively*, 311 Neb. 160, 971 N.W.2d 128 (2022).

6. ATTORNEY FEES

Jacqueline asserts that the district court erred in failing to award her attorney fees. Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Buderus v. Buderus*, 30 Neb. App. 589, 971 N.W.2d 359 (2022). Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits. *Id.* A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases. *Id.*

In this case, Jaqueline argues that she was entitled to attorney fees because the decree should not have been modified or, if modified, she should have prevailed in her request for custody of all three children. However, because we conclude that the district court did not abuse its discretion in modifying the decree to award Ryan sole legal and physical custody of Kiersten (or in any of the other modifications discussed above), we disagree that Jacqueline prevailed in this matter. Accordingly, we conclude the court did not abuse its discretion in declining to award attorney fees to Jacqueline.

VI. CONCLUSION

The district court did not abuse its discretion in modifying the decree as discussed above. Accordingly, we affirm the order of modification.

AFFIRMED.

- 15 -