Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/18/2023 09:07 AM CDT

ASHLEY A. HAWKS, APPELLEE, V.
JEFF A. HAWKS, APPELLANT.
___ N.W.2d ___

Filed July 11, 2023.    No. A-22-578.

1. **Contempt: Appeal and Error.** In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which the trial court's (1) resolution of issues of law is reviewed de novo, (2) factual findings are reviewed for clear error, and (3) determinations of whether a party is in contempt and of the sanction imposed are reviewed for abuse of discretion.

2. **Attorney Fees: Appeal and Error.** A trial court's decision awarding or denying attorney fees will be upheld on appeal absent an abuse of discretion.

3. **Judgments: Words and Phrases.** A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result.

4. **Contempt: Words and Phrases.** When a party to an action fails to comply with a court order made for the benefit of the opposing party, such act is ordinarily a civil contempt, which requires willful disobedience as an essential element. "Willful" means the violation was committed intentionally, with knowledge that the act violated the court order.

5. **Contempt: Proof: Presumptions.** Outside of statutory procedures imposing a different standard or an evidentiary presumption, all elements of contempt must be proved by the complainant by clear and convincing evidence.

6. **Attorney Fees.** Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees.

7. ____. Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits.

8. **Actions: Attorney Fees: Words and Phrases.** A frivolous action is one in which a litigant asserts a legal position wholly without merit; that is, the position is without rational argument based on law and evidence to support the litigant's position.

9. **Contempt: Attorney Fees.** In the context of a contempt proceeding, a trial court may award attorney fees in its discretion only in cases in which the court finds a party in contempt.

10. **Actions: Contempt: Attorney Fees.** In contempt actions in domestic relations cases, a trial court is authorized to award attorney fees only against a party found to be in contempt under Neb. Rev. Stat. § 42-370 (Reissue 2016) or Neb. Rev. Stat. § 42-364.15 (Reissue 2016), or if a trial court determines the contempt action is frivolous, attorney fees maybe be awarded under Neb. Rev. Stat. § 25-824 (Reissue 2016).

Appeal from the District Court for Gage County: JULIE D. SMITH, Judge. Affirmed in part, and in part reversed and remanded with directions.

Megan M. Zobel, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellant.

Stephanie L. Clark, of Nelson, Clark & Timan, P.C., for appellee.

PIRTLE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

The Gage County District Court declined to hold Ashley A. Hawks in contempt of court in association with Jeff A. Hawks' missed parenting time with his three children following Jeff's release from prison. The court did find Ashley in contempt for failing to pay supervised parenting time fees in violation of a temporary order requiring her to do so if any of the children missed their court-ordered parenting time with their father. Each party was ordered to pay a portion of the other party's attorney fees, and after reducing what Jeff was ordered to pay by what Ashley was ordered to pay, Jeff had 45 days to pay $15,890 toward Ashley's attorney fees. Jeff

appeals the court's failure to find Ashley in contempt regarding the missed parenting time and the court's order directing him to pay a portion of Ashley's attorney fees. For the reasons set forth below, we affirm the court's order declining to hold Ashley in contempt regarding the missed parenting time but reverse the court's order regarding attorney fees and remand the cause with directions.

## II. BACKGROUND

### 1. PRETRIAL PROCEEDINGS

Ashley and Jeff were married in 2009. They have three children together: Andrew Hawks, born in 2011; Katelyn Hawks, born in 2013; and Gracie Hawks, born in 2015. From February 2016 until August 2020, Jeff was incarcerated following his conviction on two counts of third degree sexual assault of a child (not involving his own children). During that time, the district court entered a decree on August 2, 2018, dissolving Ashley and Jeff's marriage. Under the decree, Ashley and Jeff were awarded joint legal custody of the children and Ashley was awarded primary physical custody. A settlement agreement was attached as an exhibit and incorporated into the decree by reference. The settlement agreement included a parenting plan, which stated that it was "anticipated that [Jeff would] remain incarcerated until approximately December 2020." The parenting plan provided that Ashley "shall take . . . at least one of the children to visit [Jeff] twice a month" for the duration of his incarceration. It further provided that "[i]f the parties are unable to agree to a specific parenting time schedule after [Jeff's] release from incarceration, either party may file a Complaint to Modify seeking to address the issue of parenting time."

Jeff was "placed on parole" in August 2020 and "was done with parole" the following month. On October 27, he filed a "Complaint for Modification," claiming that his release from incarceration was a material change in circumstances warranting an increase in his parenting time. Ashley filed

an "Answer and Cross Complaint," requesting, among other things, that the court award the parties joint legal custody and Ashley physical custody of the children, subject to Jeff's reasonable rights of supervised visitation. That same day, Jeff filed a "Motion for Parenting Time," requesting that the court enter a temporary order granting him parenting time with the children.

Following a hearing, the district court entered a temporary order on December 17, 2020, awarding Jeff supervised parenting time with the minor children every other Sunday from 9 a.m. until 5 p.m. and every Wednesday from 2 until 7 p.m. The temporary order also required that Jeff pay any fees associated with the supervision of his parenting time.

On May 14, 2021, Jeff filed a "Motion to Revisit Temporary Parenting Time," alleging that he had incurred $11,000 in supervision fees even though he had been "denied [his] parenting time on at least 25 occasions since the entry of the Temporary Order." He further alleged that "there have been no safety concerns reported during any visits with the minor children" and requested that the court "revisit the issue of temporary parenting time, including whether visits should be supervised, who supervises and the cost of said supervisors."

Jeff simultaneously filed a "Verified Application for Order to Show Cause," alleging that Ashley had violated the December 17, 2020, temporary order. Specifically, Jeff listed 25 separate dates where Ashley allegedly "interfered with and/or denied [Jeff his] parenting time with" one or more of the children. Jeff alleged that he had incurred $11,040 in supervised visitation costs through May 8, 2021, and that due to the lack of visitation, "the visitation company may no longer be able to provide visitation services." He requested that judgment be entered in his favor and that he "recover costs incurred . . . including reasonable attorney's fees." On May 19, the district court entered an "Order to Show Cause," ordering Ashley to appear before the court and show why she should not be found in contempt of court.

Following a hearing on Jeff's motion to revisit parenting time, the district court entered an amended temporary order on July 10, 2021. The amended order changed Jeff's supervised parenting time to every other Saturday from noon until 5 p.m. and every Wednesday from 2 to 6 p.m., permitted certain individuals to supervise Jeff's parenting time, and required that Ashley pay for supervision fees for any children who did not attend Jeff's parenting time.

On January 28, 2022, Jeff filed a "Verified Amended Application for Order to Show Cause," alleging that there had been 69 instances where Ashley "interfered with and/or denied [Jeff his] parenting time with" one or more of the children. He further stated that since the entry of the amended temporary order, Ashley failed to reimburse Jeff for $1,460 in supervision fees for missed parenting time. He also alleged that "due to the lack of visitation that has occurred from December 2020 until January 2022, the Pathfinders visitation company suspended services with Jeff" and Jeff has struggled to find another supervision service. On January 31, the district court entered an order to show cause, ordering Ashley to appear before the court and show why she should not be found in contempt.

### 2. TRIAL

Trial was held on the contempt action only on February 14, April 4 and 12, and May 13, 2022. Ashley and Jeff testified, as well as several other witnesses, and exhibits were received. The evidence relevant to the issues on appeal follows.

### (a) Jeff's Incarceration

Jeff testified that he was convicted of "two counts of third degree sexual assault of a child" and began a 4½-year period of incarceration on February 9, 2016. He testified that, at that time, "Andrew was four, Katelyn had just turned three, and Gracie was ten months" old. Early on in Jeff's incarceration, the children generally visited Jeff on a weekly basis.

Ashley transported the children to visit Jeff prior to the dissolution of their marriage in August 2018, at which point the district court ordered that Jeff have two visits per month with at least one of the children. Jeff stated that the visits happened "[v]ery regularly at the beginning, but towards the end" of his incarceration, "there were some months that [he] didn't get both visits." Jeff stated that his father brought the children to most of the visits following the divorce and that Ashley brought them to a few of the visits. Jeff stated that the visits were 4 hours long and that he and the children often played in the gym, played games, or had "father/daughter dances." He stated that the visits "went well" and that the children "would hug [him] at the beginning of visits, and at the end of visits." Jeff also stated that he regularly spoke with the children on the phone and that he had two 12-hour furloughs during his incarceration to celebrate Christmas and Katelyn's birthday.

(b) First Temporary Order

When Jeff was released from prison in August 2020, he and Ashley informally arranged visits with the children, where they "would meet . . . for an ice cream cone in a park or go[] to the skate park." Jeff subsequently filed his modification complaint and request for parenting time because he did not feel that his time with the children was occurring regularly and "Ashley was insisting on her presence there."

When the district court entered the first temporary order in December 2020 granting Jeff supervised parenting time, Jeff hired Pathfinders for supervision services. He consulted with Ashley about the service ahead of time. Jeff stated that he paid for the services, which amounted to thousands of dollars in fees, and that he was charged for the services even when the children did not attend his parenting time. Jeff testified that under the initial temporary order, he was supposed to have 180 hours of parenting time between December 26, 2020, and June 16, 2021, but he was only able to exercise 35 hours with Andrew, 80 with Katelyn, and 130 with Gracie.

Text messages between Ashley and Jeff discussing Ashley's terms for Jeff's parenting time were received into evidence. In one message, Ashley indicated that she would prefer the supervisor be a woman in case it was necessary for the supervisor to take Gracie to the bathroom. In another message, Ashley stated, "You will not be helping the kids change their pants or wiping butts, giving baths or anything like that." She further wrote, "[T]he communication between the kids and I will be very open. And safety rules will be explained." In another message, Ashley told Jeff he would have to participate in "specialized treatment" for him to earn her trust back. She stated, "I will not take any chances at all with my kids. I know you want to think you would never hurt them but [I'm] sure you believed you would never hurt those boys and you did." On cross-examination, Jeff stated that it was appropriate for Ashley to share her concerns with him.

On December 26, 2020, the children went to Jeff's house for their first visit. Jeff said that Ashley texted him during the visit to inform him that the children were texting her, asking her to pick them up early. Jeff believed this interfered with his parenting time; however, the children ultimately "stayed the entire time and it was a good visit."

The children visited Jeff again on December 30, 2020, and January 1, 2021. Jeff described an instance where the children were arguing about whether they could play "tag" with him. When he asked them why they would not be able to play tag, they said that "it was a rule." When he questioned Ashley about the rule, she responded in a text message that she had previously discussed with the children "grooming behaviors by adults and how grooming usually starts with nonsexual touching, such as accidental touching during play like tag, wrestling or things like that. Then that kind of touching desensitize[s] kids so they don't resist more sexualized touching."

Jeff asked Ashley whether the children had been given rules for his house. Ashley responded that she did not give

the children rules specifically about him, but they had been educated about "good touch, bad touch," and that "they are in charge of their bodies and don't have to have physical contact with anyone they don't want to." She stated that "[t]his is all in general, not just about [Jeff]." Jeff indicated that he was concerned that Ashley was having these conversations with the children outside of his presence. He wanted to be involved in the conversations because "it would show a unified front to the kids . . . and help them understand that the conversations are not necessarily about [him] but about their safety in general."

According to Jeff, over time the children attended his parenting time "less and less," although Ashley brought the children to his house for almost all of his scheduled parenting time. Jeff stated that the only times Ashley did not transport the kids to his parenting time were two occasions where she canceled Jeff's parenting time. In one instance, she canceled because she had a medical appointment in Omaha, Nebraska, that ran long. On another occasion, she canceled because something came up at work and she was not able to transport the children to Jeff's house. Ashley did not want to make the third party who picked up the children have to drop them off at Jeff's house because she did not want to subject that person to the stress of transitions. Jeff stated that Ashley offered to schedule "make up" visits for his missed parenting time, although they had not made up one of the two missed visits at the time of trial. When asked whether he had requested to make up that parenting time, Jeff responded that he had not requested to make up the parenting time because "it's been difficult, with supervisors and [the children's] basketball."

### (c) Attempted Transitions

During the attempted transitions, Ashley would park her vehicle in front of Jeff's house, sometimes leaving it running. Jeff stated that Ashley would get out of the vehicle at some point, but sometimes not until he walked out to the vehicle.

Jeff "could kind of get a sense of how the kids were feeling" when he approached the vehicle. Sometimes, Gracie screamed, and Katelyn and Andrew ignored him. Other times, the children were calm and conversational. Whether the situation escalated depended on the children's moods. According to Jeff, they generally spent "between 40 minutes and 60 minutes . . . at the car" attempting to coax the children to exit the vehicle and attend parenting time with him.

Jeff described Andrew as the "most resistive and . . . argumentative" among the children during transitions to Jeff's parenting time. Andrew was sometimes "disrespectful" and would not let Jeff talk or he would make noises as Jeff talked. One time he called Jeff a "dumb ass," and there were a couple of instances where he left the vehicle and began walking away from the house. According to Jeff, when Andrew is disrespectful, Ashley will "say his name or give him a look. But . . . she's fairly quiet during it, maybe trying to change the subject . . . ."

Jeff testified that Katelyn's behavior during transitions was "quieter" and "not as argumentative," but she still had outbursts at times. Gracie threw tantrums and screamed during transitions. The children sometimes said that they did not trust Jeff and that he was not their father. Ashley's focus during drop offs was on keeping the children calm, while Jeff was focused on convincing the children to exit the vehicle. When asked whether Ashley imposed "consequences" for the children's refusal to leave the vehicle, Jeff responded that he had not heard "anything specific from her on consequences that she's implemented." However, when the children's therapist, Brenda Wilcox, was asked whether the children "should have a consequence if they don't go" to Jeff's parenting time, Wilcox responded, "No."

Ashley stated that she generally did not "give out consequences" to the children for disrespecting Jeff, but they would discuss it later "after they've calmed down." She stated that giving consequences was not part of her parenting style

generally. When the children were disrespectful during transitions, she tried to calmly interject by "mak[ing] eye contact with them, try[ing] to hold their hand, try[ing] to redirect them into a different conversation." She stated that Jeff immediately responded when they were disrespectful to him and her, and "adding fuel to the fire" was not going to help because "they're already escalated."

When asked whether he believed Ashley was "doing everything she [could] to get the children to go to . . . parenting time," Jeff responded, "No." He elaborated that he believed they could "show a more unified front." Jeff stated that they disagreed on how long to wait at the vehicle to get the children to come into his house for parenting time. On numerous occasions he had asked Ashley to stay "as long as it takes." Wilcox testified that she believed "after an hour, hour 15 minutes[,] it [is] counterproductive" to continue trying to get the children to attend Jeff's parenting time.

Ashley testified that she encouraged the children to attend Jeff's parenting time by speaking with the children the night before and the morning of and asking them whether they would like to take any of their belongings with them. She stated that if one of them was needing something for "their activities or their sports or new shoes or something," she suggested to the children that they purchase the item with Jeff "to get them excited about . . . getting something with their dad." Wilcox believed there was nothing more Ashley could do to get the children to attend Jeff's parenting time. When Wilcox was asked whether she had seen any behavior by Ashley that would lead her to believe Ashley was "sabotaging [the] relationship" between the children and Jeff, Wilcox responded, "No."

When Ashley was asked whether she believed the children "should have a say when it comes to attending parenting time with [Jeff]," she responded that she did not believe the children should have a say, but that there was "a lot of work to do with the kids personally and . . . through family

counseling with their dad to try to build that relationship back."
When asked whether she would like Jeff "to be a constant in
[the children's] life," Ashley responded, "Absolutely."

### (d) April 14, 2021, Incident

Jeff described an incident that took place on April 14, 2021,
when Ashley picked Andrew up from Jeff's home 1½ hours
before Jeff's parenting time was over. Andrew had texted
Ashley that he had a headache and wanted her to pick him
up. Ashley notified Jeff and suggested that he give Andrew
"Tylenol, maybe Sprite . . . and a snack."

According to Ashley, Andrew threatened to run away from
Jeff's house if she did not pick him up and she was worried
that Andrew would leave Jeff's house and walk toward her
home along a busy road with no sidewalk. Ashley sought
advice from Wilcox, who testified that she believed "Andrew
had taken off walking" based on what Ashley said to her.
Wilcox told Ashley that "it may not have been in the best
interest of the situation that Andrew stay." Ashley then noti-
fied Jeff that she was picking Andrew up and called Jeff when
she was in his driveway and Andrew was in the vehicle with
her. Andrew was already outside Jeff's house when Ashley
arrived. Ashley testified that she was "follow[ing] [Wilcox's]
recommendation, but in hindsight, [she] should have let [Jeff]"
handle the situation.

### (e) Text Messages Regarding
### Children's Behavior

Ashley sent Jeff the following text message on May 7,
2021: "Andrew said he is not stayin[g] for visit and does not
want to get up early and ride in the car for 2 h[ours] just to
go to [L]incoln and straight back. Katelyn is still saying she
does not want to go. Just fyi." When asked whether it was
the children's choice whether to go to Jeff's parenting time,
Ashley responded, "No. I think I was just preparing Jeff for
how they were behaving that morning." According to Ashley,

when she notified Jeff that the children did not want to attend parenting time with him, it was to "giv[e] him the heads-up" about the children's mood, not to signify that she was not bringing them to his parenting time. Jeff confirmed that Ashley frequently informed him of the children's mood before visits so he would know what to expect.

### (f) June 5, 2021, Incident

Ashley drove all three children from Beatrice, Nebraska, to Lincoln, Nebraska, for Jeff's parenting time so Jeff could take them to the zoo. Gracie and Katelyn attended parenting time that day, but Andrew did not. Ashley looked for things to do to pass the time with Andrew. She and Andrew went to the mall, where they walked around. She stated that "Andrew spotted an arcade," which she did not know was in the mall. They entered the arcade, "got a snack in there, and then [Andrew] wanted to play a few games." They were in the arcade for "[m]aybe 10 minutes, 15."

### (g) July 2021 Amended
### Temporary Order

In June 2021, Jeff filed a motion with the district court to "revisit parenting time" because Pathfinders informed him it would no longer be providing supervision services to him and he was struggling to find other supervision services. He stated that "[t]he kids weren't attending regularly" and he "didn't feel like it was a priority of Ashley to get [the children] to attend visits." On July 10, the court entered an amended temporary order, which required Ashley to pay supervision fees for any children that did not attend Jeff's parenting time. Jeff testified that although there was a "brief restart" when the order was entered, the children's attendance ultimately did not improve. According to Jeff, from July 2021 until January 5, 2022, Jeff was supposed to have 130 hours of parenting time, but he had only 10 hours with Andrew, 20 hours with Katelyn, and 50 hours with Gracie.

### (h) Children's Therapy

In March 2021, Ashley began taking the children to Wilcox on a weekly basis for individual therapy. Wilcox testified that she worked with the children because they were "experiencing some anxiety . . . and they didn't want to attend visits with [Jeff]." The children expressed different reasons for not wanting to go to Jeff's parenting time. Andrew was embarrassed of and angry with Jeff. Katelyn and Gracie were not comfortable with Jeff. Wilcox indicated that it is normal for children to "have feelings about a situation such as this" and that it is acceptable to validate the children's feelings, while still setting expectations that they attend parenting time with their father.

Wilcox observed a few of the attempted transitions during the summer of 2021. She described the transitions as "stressful for the family." Wilcox observed Ashley "get out of the car a couple of different times," the children refusing to get out of it while crying and screaming, and the children "ignoring [Jeff] by . . . looking at their phones or just not responding to him." Wilcox did not believe it would be appropriate for Ashley and Jeff to physically remove the children from the vehicle. She believed it would "backfire" on Jeff and, "depending on the details and the context, it could maybe cause some trauma" for the children. Both Ashley and Jeff testified that they agreed not to forcibly remove the children from the vehicle.

Jeff testified that in October 2021, he suggested taking the children to family therapy, but Ashley wanted the children to wait a few weeks before beginning family therapy so they could prepare for it. In November 2021, Jeff and the children began attending family therapy sessions with Wilcox every 2 weeks. On weeks that the children did not have family therapy, they were scheduled for individual therapy. According to Jeff, by the first day of trial, the children had attended "[f]ive or six" family therapy sessions with him. Gracie attended

all the family therapy sessions; Andrew and Katelyn missed one session because they refused to attend.

Wilcox stated that Ashley was receptive to Jeff's participation in family therapy with the children. She stated the focus of family therapy was on "enhancing [Jeff's] relationship with the children." This was why Ashley was not generally involved in family therapy. Wilcox testified that the children had made progress in her time working with them but not as much as she had hoped by the time of trial. She stated that Andrew was at a "developmental age and stage where he is learning to assert himself and so he is defiant sometimes." She stated that he was distracting for Katelyn and Gracie and sometimes disruptive during family therapy.

Jeff testified that Ashley did not schedule the children to attend individual therapy from early November 2021 to early January 2022. Ashley explained that she attempted to schedule the children's individual therapy appointments with Wilcox during this period, but their schedules did not align. Ashley also stated that "the kids had several orthodontist appointments and eye appointments" and "it was just a really busy time, so it was just missed unintentionally." The court had not ordered that the children attend family or individual therapy at any point.

(i) Wednesday Parenting Time

Jeff testified that he "didn't feel [Ashley] was very supportive with Wednesday visits." Ashley admitted that she was initially concerned about Jeff's Wednesday parenting time because she believed it may disrupt the children's routine, but she ultimately brought the children to the visits. On January 6, 2021, the children were scheduled to attend parenting time with Jeff on a Wednesday for the first time. When Ashley arrived with the children, the children refused to exit the vehicle and Ashley was crying. The children did not leave the vehicle, so Ashley eventually left with them. On cross-examination, Jeff admitted that Ashley could have been upset

because the children did not want to go; Ashley did not cry or display negative emotions at any of the other attempted transitions. The following Wednesday, the children again refused to exit the vehicle and ultimately did not attend Jeff's parenting time. Over the course of that year, Ashley continued to bring the children to Jeff's house for his parenting time on Wednesdays, but she and Jeff struggled to get the children to exit the vehicle.

In January 2022, Wilcox suggested that Jeff pick the children up from school for his parenting time on Wednesdays. Wilcox stated that although Ashley had hoped the children's relationship with Jeff would have been better by the time he started picking them up from school, she followed Wilcox's recommendation. Ashley, Jeff, and Wilcox informed the children of the plan for Jeff to pick them up. Jeff testified that Ashley "took the lead and explained . . . what we were going to try and was helpful." Jeff stated that the children were upset by this information, so they had the children provide input as to where they wanted Jeff to pick them up. Ashley provided suggestions for pick-up locations and advised Jeff how she usually conducts school pick-ups.

Jeff was supposed to pick the children up from school for the first time on January 26, 2022. While Jeff was picking Gracie up, the principal of Andrew and Katelyn's school called to inform Jeff that Andrew and Katelyn left in a maroon vehicle and had arrived at the YMCA where Ashley works. Ashley and Jeff later learned that the mother of one of Andrew's friends had taken Andrew and Katelyn to the YMCA. The friend's mother testified that nobody asked her to pick up Andrew and Katelyn that day, but after picking her son up from school, she saw Andrew and Katelyn walking "about a block and a half" away from the school. When she asked Andrew where they were going, he informed her they were going to the YMCA. It was windy outside and she knew that Andrew was recovering from a foot injury, so she offered to give Andrew and Katelyn a ride. She dropped them off

at the YMCA and left. The friend's mother testified that she did not talk to Ashley before dropping the children off and that she did not know that Jeff was supposed to pick them up for his parenting time.

That day, Jeff and the principal of Gracie's school struggled for over an hour to get Gracie to go with Jeff. Gracie eventually left with Jeff once he assured her that she could stop by the YMCA to give Ashley a hug. Ashley informed Jeff that he could not be on YMCA property because he is a registered sex offender. She instructed him to park across the street and have the supervisor walk Gracie to the YMCA.

Ashley testified that when Gracie arrived at the YMCA, she gave her a gumball and encouraged her to go back out to Jeff's vehicle. She learned at that time that Andrew and Katelyn had entered the pool without her permission. Andrew and Katelyn did not attend Jeff's parenting time until Ashley had completed her workday. She transported them to Jeff's house where they ate a pizza that Jeff and Gracie prepared together. Jeff stated that Andrew and Katelyn were there for "15, 20 minutes or so." Ashley stated that she did not remember giving Andrew and Katelyn "specific consequences" for the incident but that she discussed with them that what they did "wasn't right."

Andrew and Katelyn have continued to walk to the YMCA on Wednesdays instead of waiting for Jeff to pick them up for his parenting time. Ashley stated that she takes away Andrew's and Katelyn's phones when they avoid being picked up by Jeff on Wednesdays.

### 3. District Court's
### July 9, 2022, Order

The district court entered an order finding that Ashley was not in willful contempt of court regarding parenting time but was in willful contempt regarding nonpayment of fees for missed supervised parenting time.

#### (a) Not in Willful Contempt
#### Related to Parenting Time

Regarding parenting time, the district court concluded Jeff had not met his burden of proving, by clear and convincing evidence, that Ashley was in willful contempt for interfering with his parenting time. The court explained:

> There is simply no evidence of any wrongdoing on [Ashley's] part. To the contrary, [Ashley] seems to be making every possible effort, short of physical force, to get the children to attend [Jeff's] parenting time. Both parties have agreed not to use physical force. It is no more [Ashley's] fault than it is [Jeff's] that the children will not get out of the vehicle for [Jeff's] parenting time. This is an unfortunate situation. [Jeff] was in prison for 4.5 years. The children, particularly the older two, are having a difficult time with these family dynamics. The parents are both making efforts, including trying to coparent and having the children in counseling. The relationship with the children may never return to what it was prior to the incarceration, and if it does, that is going to take time. [Ashley] is not in willful contempt of court.

#### (b) Willful Contempt for
#### Nonpayment of Fees

The district court did find Ashley in contempt of court for failing to reimburse Jeff $1,460 in parenting time supervision fees since the entry of the July 10, 2021, temporary order. The court recognized that "the parties have a disparity in income" but that there was no evidence Ashley had "any type of disability which would prevent her from earning the money through regular or supplemental employment." The court further noted that Ashley had borrowed money to pay her attorney fees and there was "no evidence to suggest that she could not have done the same to meet her financial obligations under the July 10, 2021[,] order." The court found that

Ashley was "in willful contempt for failure to reimburse [Jeff] in the amount of $1,460."

### (c) Modification of Supervised Parenting Time

The district court further noted that it could modify a parenting plan in a contempt action. It pointed out that Jeff had spent "over $14,000.00 on supervised parenting time." The court explained that the "main purpose of the supervised parenting time was to ensure that the children are safe, given [Jeff's] conviction" and the "main purpose of ordering [Ashley] to pay for visits which the child(ren) failed to attend was to give her a financial incentive to ensure that all three children attend parenting time," but that "[t]his is not working." The court observed that "there have been no safety concerns for the children while in their father's care," and witnesses testified that they had not observed any safety concerns, the children appeared comfortable, Jeff appropriately cared for the children during visits, and Jeff "is a safe parent." The court also stated that Ashley testified she believed the children were safe during visits and that no safety concerns had been reported to her. Therefore, "[h]aving professionals supervise these visits has been expensive, and it appears to be unnecessary." The court proceeded to amend the July 10, 2021, amended temporary order to allow "'the children's paternal grandfather, another mutually-agreeable adult member of the father's family . . . or another mutually-agreeable . . . individual'" to supervise Jeff's parenting time. It further directed that Ashley "'shall not use the inability to agree upon a supervisor as a reason for withholding parenting time'" and that if she does not agree upon a suitable person, "'she shall be prepared to provide the Court with a reasonable, articulable justification for disagreeing on the supervisor.'"

### (d) Attorney Fees

Regarding attorney fees, the district court indicated it had "the power to award attorney's fees in a contempt action."

It determined that Ashley's "reasonable attorney's fees are approximately $22,000" and Jeff's "reasonable attorney's fees are approximately $24,500." The court approximated that 90 percent of the case was spent on "parenting time issues" and 10 percent was spent on "failing to pay supervision fees." Since the court found that Jeff's "action against [Ashley] regarding the parenting time was without merit," it ordered Jeff to pay Ashley's attorney fees of $19,800 (90 percent of Ashley's attorney fees of $22,000). And since the court found Ashley was "in willful contempt for failure to pay the supervision fees," it ordered Ashley to pay Jeff's attorney fees in the amount of $2,450 (10 percent of Jeff's attorney's fees of $24,500).

The court ordered Ashley to serve 14 days in jail for failing to pay the supervision fees but provided that she could purge herself of contempt by paying Jeff the $1,460 in supervision fees and the $2,450 in attorney fees. It ordered Jeff to pay $15,890 to the district court clerk within 45 days. The court further ordered that "[b]ecause the amount owed by [Ashley] has been allocated to reduce the amount [Jeff] is required to pay, the Court finds that [Ashley] has purged herself of contempt and will not have to serve the fourteen (14) days in jail."

Jeff appeals.

### III. ASSIGNMENTS OF ERROR

Jeff assigns that the district court abused its discretion in (1) failing to find Ashley in contempt of court for her interference and denial of parenting time and (2) ordering him to pay attorney fees.

### IV. STANDARD OF REVIEW

[1] In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which the trial court's (1) resolution of issues of law is reviewed de novo, (2) factual findings are reviewed for clear

error, and (3) determinations of whether a party is in contempt and of the sanction imposed are reviewed for abuse of discretion. *Cech v. Cech*, 30 Neb. App. 618, 971 N.W.2d 801 (2022).

[2,3] A trial court's decision awarding or denying attorney fees will be upheld on appeal absent an abuse of discretion. *In re Estate of Forgey*, 298 Neb. 865, 906 N.W.2d 618 (2018). A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id*.

## V. ANALYSIS

### 1. CONTEMPT

Jeff contends the district court abused its discretion in failing to find Ashley in contempt of court for her interference and denial of his parenting time.

[4,5] Civil contempt proceedings are instituted to preserve and enforce the rights of private parties to a suit when a party fails to comply with a court order made for the benefit of the opposing party. See, *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012); *Smeal Fire Apparatus Co. v. Kreikemeier*, 279 Neb. 661, 782 N.W.2d 848 (2010), *disapproved on other grounds, Hossaini v. Vaelizadeh, supra*. Willful disobedience is an essential element of contempt; "willful" means the violation was committed intentionally, with knowledge that the act violated the court order. *Hossaini v. Vaelizadeh, supra*. Outside of statutory procedures imposing a different standard or an evidentiary presumption, all elements of contempt must be proved by the complainant by clear and convincing evidence. See *Smeal Fire Apparatus Co. v. Kreikemeier, supra*.

With respect to contempt proceedings related to interference with visitation and parenting time, the Nebraska appellate courts have looked to the custodial parent's conduct and whether the parenting time actually occurred. See *Rodas v. Franco*, 30 Neb. App. 910, 974 N.W.2d 856 (2022).

For example, in *Krejci v. Krejci*, 304 Neb. 302, 934 N.W.2d 179 (2019), the Nebraska Supreme Court affirmed a trial court's decision not to hold a mother in contempt for the children's nonattendance of the grandfather's visitation time because the mother did not encourage or instruct the children to refuse to attend the visit. In *Martin v. Martin*, 294 Neb. 106, 881 N.W.2d 174 (2016), the Nebraska Supreme Court upheld a decision by a trial court to hold a parent in contempt where that parent consistently transferred the responsibility of deciding whether to attend parenting time to the children and the noncustodial parent repeatedly was unable to exercise his court-ordered parenting time.

Most recently, in *Rodas v. Franco, supra*, this court reversed a finding of contempt against the mother, the custodial parent, where the father missed his scheduled parenting time on various occasions even though the mother encouraged the child to attend the father's parenting time, enrolled the child in therapy where the therapist worked with the child on attending the father's parenting time, and transported the child and his belongings to each transition while attempting to convince him to go with the father.

Jeff argues that the facts of the present case are like those in *Martin v. Martin, supra*, where the father was not able to exercise his parenting time with his sons on numerous occasions over a 4-month period. There, the trial court received evidence of communications between the parties that showed the mother was deferring to the decisions of the children that they did not want to go to the father's parenting time and placing the responsibility on the father to make the children spend parenting time with him. The Nebraska Supreme Court determined the lower court did not abuse its discretion in finding the mother's behavior to be in willful contempt, stating:

> As a singular event, [the mother's] allowing the boys to exercise the final decisionmaking authority in regard to [the father's] parenting time may have been defensible, but the consistent pattern of her transferring her

responsibility to the boys supports the finding of the trial court. [The mother's] continued behavior, coupled with the evidence that [the father] was not able to exercise his court-ordered parenting time, leads to the further finding that there was no abuse of discretion by the trial court in determining [the mother] was in willful contempt for not allowing [the father] parenting time as ordered.

*Id*. at 119, 881 N.W.2d at 183-84.

On the other hand, Ashley argues that the facts of the present case are more comparable to *Rodas v. Franco*, 30 Neb. App. 910, 974 N.W.2d 856 (2022).

In *Rodas v. Franco, supra*, there was no evidence that the mother told the child he was free to refuse to attend his father's parenting time or discouraged him from going. This court observed that when the child expressed that he did not want to attend the father's parenting time, the mother "would try to calm him down, encourage him to spend time with [the father], remind him of the fun things they would do together, and assure him that she would call him while he was gone." *Id.* at 945, 974 N.W.2d at 879. The mother also spoke with the family therapist about how to make exchanges go smoothly. Despite the mother's encouragement, the child often refused to attend his father's parenting time. The family therapist advised against physically forcing the child to attend the father's parenting time because it could be emotionally damaging for him.

Here, it was undisputed that Jeff was unable to exercise his parenting time with at least one of the children during the 69 days listed in his amended application for order to show cause. Jeff argues that, similar to *Martin v. Martin*, 294 Neb. 106, 881 N.W.2d 174 (2016), Ashley interfered with his parenting time by "permitting the children to have a choice and by giving them the authority to decide whether they want to attend parenting time or not." Brief for appellant at 29. However, Ashley testified that when she discusses Jeff's parenting time with the children, she "never lay[s] it out to them

like they have a choice"; she simply notifies them that they "have Dad's today." Ashley transported the children to Jeff's house or another agreed-upon location for almost all of Jeff's scheduled parenting time. There were only two times when Ashley did not transport the children: once when she had a medical appointment in Omaha that ran long and once when something came up at work. Because of the difficulty Ashley and Jeff had getting the children to cooperate in parenting time transitions, Ashley was not comfortable asking a third party to transport the children for her.

Before bringing the children to Jeff's house, Ashley actively encouraged them to attend Jeff's parenting time by suggesting that they bring certain belongings with them or have Jeff take them to buy certain items they need for their activities. Despite Ashley's efforts, when she took the children to Jeff's house, they often refused to exit the vehicle.

Ashley and Jeff had to coax the children to exit the vehicle for an average of 40 to 60 minutes at each attempted transition. When the children were acting out in the vehicle, Ashley attempted to calm them down. Additionally, Wilcox testified that Ashley helped with "brainstorming" ideas for how to get the children to attend Jeff's parenting time. Wilcox also stated that she believed Ashley was doing all she could to get the children to attend Jeff's parenting time, short of physically removing the children from the vehicle, which Wilcox advised could "backfire." Regarding the lack of "consequences" imposed by Ashley for the children's non-attendance of Jeff's parenting time, Wilcox testified that she did not believe the children should be punished for that. Additionally, Ashley testified that imposing consequences is not generally a part of her parenting style. Regardless, when Andrew and Katelyn went to the YMCA instead of Jeff's Wednesday parenting time, Ashley took away their phones for part of the evening.

Ashley enrolled the children in individual therapy in March 2021, in hopes of improving the children's relationship

with Jeff. The children also began attending family therapy with Jeff in November. Wilcox testified that Ashley was receptive to Jeff's participation in family therapy. Even so, Jeff claims that Ashley "failed to make the children's individual and family therapy a priority." Brief for appellant at 23. He points out that Ashley failed to schedule the children for individual therapy from early November 2021 to early January 2022. However, Ashley explained that her failure to schedule the appointments during this period was not intentional; it was simply a busy time, and she could not get schedules to align. During this time, the children continued to attend family therapy, and in January 2022, the children resumed their individual therapy.

Jeff argues that Ashley has "passively interfered" with his parenting time by discussing safety rules with the children. Brief for appellant for 23. However, Ashley testified that she did not discuss grooming, "good touch" and "bad touch," or any other safety rules with the children in relation to Jeff specifically; she discussed such issues with the children in general terms.

Jeff contends *Rodas v. Franco*, 30 Neb. App. 910, 974 N.W.2d 856 (2022), is distinguishable because the amount of missed parenting time in this case is greater than in *Rodas*. However, the circumstances in this case are unique in that the children's relationship with Jeff was damaged because he was incarcerated for a period of 4½ years for two convictions of third degree sexual assault of a child. Ashley is attempting to maintain the children's safety while also trying to support the children's relationship with Jeff. We agree with the district court's observation that it may take time for Jeff to heal his relationship with the children.

While we recognize that the responsibility for adhering to a parenting plan does not and should not devolve to the children, the clear and convincing evidence does not establish that Ashley intentionally interfered with Jeff's parenting time. Accordingly, the district court did not abuse its discretion

in finding that Ashley was not in contempt of court regarding the missed parenting time.

## 2. Attorney Fees

Jeff also assigns that the district court abused its discretion in ordering him to pay $19,800 of Ashley's attorney fees. He points out that he had missed over 69 days of parenting time so his case "was filed with merit and was not frivolous." Brief for appellant at 36. Jeff further argues that he "was not found in contempt, nor was there an action on file for him to be found in contempt," and that attorney fees are awarded "when there has been a finding of contempt." *Id*. We agree with Jeff that the court abused its discretion by ordering him to pay a portion of Ashley's attorney fees, since there is no authority for such an award.

[6-8] Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits. *Id*. Additionally, Neb. Rev. Stat. § 25-824 (Reissue 2016) provides for "reasonable attorney's fees and court costs against any attorney or party who has brought or defended a civil action that alleges a claim or defense which a court determines is frivolous or made in bad faith." A frivolous action is one in which a litigant asserts a legal position wholly without merit; that is, the position is without rational argument based on law and evidence to support the litigant's position. *Nathan v. McDermott*, 306 Neb. 216, 945 N.W.2d 92 (2020). The district court made no finding that Jeff's action was frivolous, nor would the record support such a finding.

Specific to contempt proceedings in domestic relations actions, Neb. Rev. Stat. § 42-370 (Reissue 2016) provides that "[c]osts, including a reasonable attorney's fee, may be taxed against a party found to be in contempt." The statute

is silent as to the availability of awarding attorney fees for successfully defending a contempt action. Additionally, Neb. Rev. Stat. § 42-364.15 (Reissue 2016) provides for "reasonable attorney's fees" to be taxed against a parent found in contempt in the enforcement of orders relating to "parenting time, visitation, or other access" with a minor child.

[9] In *Hoppe v. Hoppe*, No. A-98-1153, 2000 WL 4136 (Neb. App. Jan. 4, 2000) (not designated for permanent publication) (petition for further review denied March 1, 2000), this court reversed a trial court's award of attorney fees to a party who successfully defended against a contempt action. After examining § 42-370 and case law supporting an award of attorney fees against someone found in contempt, this court determined that "[u]nder Nebraska law, a trial court may award attorney fees in its discretion only in cases in which the court finds a party in contempt." 2000 WL 4136 at *7. See, also, *Wiseman v. Wiseman*, No. A-04-514, 2005 WL 2347678 (Neb. App. Sept. 27, 2005) (not designated for permanent publication) (trial court abused its discretion by ordering former husband to pay attorney fees when he was not found in contempt, nor was his request for show cause order frivolous).

[10] Accordingly, in contempt actions in domestic relations cases, a trial court is authorized to award attorney fees only against a party found to be in contempt under § 42-370 or § 42-364.15, or if a trial court determines the contempt action is frivolous, attorney fees maybe be awarded under § 25-824. Because Jeff was not found to be in contempt, nor was his action frivolous, the district court abused its discretion by ordering Jeff to pay any of Ashley's attorney fees, and we reverse, and remand with directions to vacate that portion of the order. And since there is now no attorney fees award owed by Jeff to offset what the court ordered Ashley to pay, we briefly address the remaining obligation under the July 9, 2022, order.

As set forth above, the district court found Ashley in contempt for failing to pay $1,460 in supervised parenting time fees. Accordingly, the court had the authority to order Ashley to pay any portion of Jeff's attorney fees, which it did, in the amount of $2,450. The court ordered Ashley to serve 14 days in jail for "failing to pay supervision fees" but allowed Ashley to "purge herself of contempt by paying $1,460.00 for supervision fees as well as $2,450.00 for attorney's fees." The court then reduced the amount of attorney fees Jeff was ordered to pay by the amounts Ashley was ordered to pay for the supervision and attorney fees, which totaled $3,910. With that reduction, the court concluded that "[b]ecause the amount owed by the mother has been allocated to reduce the amount the father is required to pay, the Court finds that the mother has purged herself of contempt and will not have to serve the fourteen (14) days in jail."

Ashley did not cross-appeal the district court's order finding her in contempt for failing to pay $1,460 in supervised parenting time fees, nor did she cross-appeal the $2,450 in attorney fees awarded to Jeff due to her willful contempt. This may be due in part to the fact that during Jeff's testimony, he acknowledged that since his filing of the application for an order to show cause, Ashley had paid the supervision fees and he was not "pursuing that issue . . . today." Despite that testimony, the court nevertheless found that there was no evidence to suggest Ashley could not have paid the fees as ordered in July 2021, and therefore, it found her to be in willful contempt for failure to reimburse Jeff the $1,460 owed. And as discussed above, reasonable attorney fees may be taxed against a party found to be in contempt. See § 42-370. Ashley did not ask the district court to reconsider its decision given the testimony that she had paid the supervision fees prior to the commencement of trial, nor did she challenge that part of the order on appeal to this court. We therefore need not consider whether the payment made before trial

commenced was sufficient to overcome Ashley's prior willful disobedience of the July 2021 temporary order.

However, as a result of our reversal of the attorney fees that Jeff was ordered to pay, the district court's attempt to apportion the fees between the parties on a proportionate basis was impacted, as was the portion of the order that found Ashley had purged herself of contempt. Now knowing that Jeff cannot be ordered to pay any portion of Ashley's attorney fees, the court should have the opportunity to reconsider whether Ashley should be ordered to pay any portion of Jeff's attorney fees, particularly given the income disparity between the parties. We therefore reverse, and remand the issue of attorney fees to the district court with directions to vacate that portion of its July 9, 2022, order, related to Ashley's payment of Jeff's attorney fees and her purge plan, and to enter a new order regarding the same.

## VI. CONCLUSION

For the reasons set forth above, we affirm the portion of the district court's July 9, 2022, order finding that Ashley was not in contempt of court regarding Jeff's missed parenting time. We reverse the portion of the court's order regarding attorney fees. We remand the cause to the district court with directions to (1) vacate the portion of the order requiring either party to pay attorney fees, (2) vacate Ashley's previous purge plan and the court's finding that Ashley had purged herself of contempt, and (3) enter a new order regarding Ashley's responsibility for Jeff's attorney fees, if any, and modifying Ashley's purge plan as appropriate.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.